880 F.2d 432
 30 ERC 1001, 279 U.S.App.D.C. 109, 58
USLW 2071,
19 Envtl. L. Rep. 21,099
 STATE OF OHIO, Petitioner,
v.
UNITED STATES DEPARTMENT OF THE INTERIOR, Manuel Lujan, Jr.,
Secretary of Department of the Interior, Respondents,
Public Service Electric and Gas Co., et al., ASARCO Inc.,
Intervenors.
NATIONAL WILDLIFE FEDERATION, et al., Petitioner,
v.
DEPARTMENT OF THE INTERIOR and United States of America, Respondents,
Edison Electric Institute, American Mining Congress, Public
Service Electric and Gas Co., et al., Chemical
Manufacturers Association, American
Petroleum Institute, ASARCO
Inc., Intervenors.
STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION,
Petitioner,
v.
UNITED STATES DEPARTMENT OF THE INTERIOR, Manuel Lujan, Jr.,
Secretary of Department of the Interior and United
States of America, Respondents,
Edison Electric Institute, American Petroleum Institute,
American Mining Congress, ASARCO, Inc., Public
Service Electric and Gas Co., Chemical
Manufacturers Association,
Intervenors.
STATE OF COLORADO, Petitioner,
v.
UNITED STATES DEPARTMENT OF THE INTERIOR, Manuel Lujan, Jr.,
Secretary of Department of the Interior and United
States of America, Respondents,
Edison Electric Institute, American Mining Congress, Public
Service Electric and Gas Co., et al., American
Petroleum Institute, ASARCO Inc.,
Chemical Manufacturers
Association, Intervenors.
STATE OF NEW YORK, et al., Petitioners,
v.
UNITED STATES DEPARTMENT OF THE INTERIOR, Manuel Lujan, Jr.,
Secretary of Department of the Interior and United
States of America, Respondents,
American Mining Congress, Public Service Electric and Gas
Co., et al., American Petroleum Institute, Edison
Electric Institute, ASARCO, Inc.,
Chemical Manufacturers
Association, Intervenors.
COMMONWEALTH OF MASSACHUSETTS, Petitioner,
v.
UNITED STATES DEPARTMENT OF THE INTERIOR, Manuel Lujan, Jr.,
Secretary of Department of the Interior and United
States of America, Respondents,
American Mining Congress, Public Service Electric and Gas
Co., et al., American Petroleum Institute, Edison
Electric Institute, ASARCO Inc.,
Chemical Manufacturers
Association, Intervenors.
PEOPLE OF THE STATE OF CALIFORNIA, ex rel. John K. Van de
Kamp, Attorney General of California, Petitioners,
v.
UNITED STATES DEPARTMENT OF THE INTERIOR, Manuel Lujan, Jr.,
Secretary of Department of the Interior and United
States of America, Respondents,
American Mining Congress, Public Service Electric and Gas
Co., et al., American Petroleum Institute, Edison
Electric Institute, ASARCO Inc.,
Chemical Manufacturers
Association, Intervenors.
CHEMICAL MANUFACTURERS ASSOCIATION, Petitioner,
v.
UNITED STATES DEPARTMENT OF THE INTERIOR, Manuel Lujan, Jr.,
Secretary of Department of the Interior and United
States of America, Respondents,
Edison Electric Institute, ASARCO Inc., National Wildlife
Federation, et al., Intervenors.
PUBLIC SERVICE ELECTRIC & GAS COMPANY, and Dana Corporation,
Petitioners,
v.
UNITED STATES DEPARTMENT OF THE INTERIOR, Manuel Lujan, Jr.,
Secretary of Department of the Interior and United
States of America, Respondents,
Edison Electric Institute, ASARCO Inc., National Wildlife
Federation, et al., Intervenors.
NATIONAL WILDLIFE FEDERATION, et al., Petitioners,
v.
UNITED STATES DEPARTMENT OF THE INTERIOR, Manuel Lujan, Jr.,
Secretary of Department of the Interior, Respondents.
STATE OF NEW YORK, et al., Petitioners,
v.
UNITED STATES DEPARTMENT OF THE INTERIOR, Manuel Lujan, Jr.,
Secretary of Department of the Interior, Respondents.
 Nos. 86-1529, 86-1575, 86-1580, 86-1585, 86-1587, 86-1590,
86-1591, 86-1594, 86-1597, 88-1291, 88-1366.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 22, 1989.
Decided July 14, 1989.
 
 Erik D. Olson and Gordon Johnson, with whom Eric Glitzenstein, Washington, D.C., Michael Bean, Robert Abrams, Charles R. Dyas, E. Dennis Muchnicki, Columbus, Ohio, Michael R. Hope, James D. Ellman, James M. Shannon, Boston, Mass., Lee P. Breckenridge, Mary E. Hackenbracht, San Francisco, Cal., James E. Tierney, Marcia J. Cleveland, Mary C. Jacobsen, Kenneth N. Tedford, Hartford, Conn., and Gary Powers were on the brief, for State and Environmental petitioners in nos. 86-1529, et al.
 Francine A. Schott, Livingston, N.J., also entered an appearance, for petitioners in no. 86-1580.
 Howard A. Kenison and Michael C. Donovan also entered appearances, for petitioners in no. 86-1585.
 Susan M. Bernard, Washington, D.C., also entered an appearance, for petitioners in no. 86-1590.
 Allene C. Zanger also entered an appearance, for petitioners in no. 86-1591.
 John A. Zackrison, with whom Amy R. Sabrin, Jeffrey N. Martin and David F. Zoll, Washington, D.C., were on the joint brief for industry petitioners in 86-1529, et al., and also entered appearances, for intervenor Chemical Mfrs. Ass'n, in nos. 86-1575, 86-1580, 86-1585, 86-1587, 86-1590, 86-1591.
 Edward W. Warren and Edmund B. Frost, Washington, D.C., also entered appearances, for petitioners in no. 86-1594.
 Lawrence E. Blatnik, Atty., Dept. of Justice, with whom Roger J. Marzulla, Asst. Atty. Gen., Washington, D.C., and Margaret Kane Harrington were on the brief, for respondents in nos. 86-1529, et al.
 Christopher Harris and Michael J. Brennan, Washington, D.C., with whom M. Elizabeth Cox, Edward M. Green, G. William Frick, Washington, D.C., Catherine Eshelman, John D. Fognani, Denver, Colo., John A. Zackrison, Jeffrey N. Martin, David F. Zoll, Toni K. Allen and Charles E. Di Leva, Washington, D.C., were on the joint brief, for intervenors.
 Eric Glitzenstein, with whom Erik D. Olson, Washington, D.C., and Michael Bean were on the brief, for intervenors Nat. Wildlife Federation, Public Citizen, and Environmental Defense Fund in nos. 86-1529, et al.
 Frank H. Morison and John D. Fognani, Denver, Colo., also entered appearances, for intervenor ASARCO, Inc. in nos. 861529, 86-1575, 86-1580, 86-1585, 86-1587, 86-1590, 86-1591, 86-1594 and 86-1597.
 Edward H. Comer and William L. Fang, Washington, D.C., also entered appearances, for intervenor Edison Elec. Institute in nos. 86-1575, 86-1580, 86-1585, 86-1587, 86-1590 and 86-1591.
 Douglas E. McAllister, Phoenix, Ariz., Roderic T. Dwyer, and M. Elizabeth Cox also entered appearances, for intervenor American Mining Congress in nos. 86-1575, 86-1580, 86-1585, 86-1587, 86-1590 and 86-1591.
 Arnold S. Block, Philadelphia, Pa., also entered an appearance, for intervenor American Petroleum Institute in nos. 86-1575, 86-1580, 86-1585, 86-1587, 86-1590, 86-1591.
 TABLE OF CONTENTS
 Page
 I. BACKGROUND ......................................................... 438
 A. Statutory Background ......................................... 438
 B. The Natural Resource Damage Assessment Regulations ........... 440
 II. STANDARD OF REVIEW 441
 III. THE "LESSEROF" RULE 441
 A. The Contours of "the Precise Question at Issue" .............. 442
 B. Text and Structure of CERCLA ................................. 444
 1. Section 107(f)(1) and the Measure of Damages 444
 a. Limitation on Uses of Recovered
 Damages ...................... 444
 b. The "Shall Not Be Limited By"
 Language ..................... 445
 2. Interior's Reading of CERCLA Secs. 301 and 107 ............ 446
 a. The "Take Into Consideration"
 Language ..................... 446
 b. The Assessment Costs Language .. 446
 c. The "Shall Not Be Limited By"
 Language ..................... 447
 3. Superfund Provisions ................................... 448
 4. Settlement Provision ................................... 449
 5. Double Recovery Provision .............................. 450
 6. CERCLA and the Clean Water Act ......................... 450
 C. Legislative History of CERCLA ................................ 450
 1. The Enactment of CERCLA in 1980 ........................ 450
 2. The Enactment of SARA in 1986 .......................... 452
 3. Congress' Rejection of the Premises Underlying the
 "LesserOf" Rule ..................................... 455
 a. CERCLA and the CommonLaw
 Measure of Damages ........... 455
 b. CERCLA and Economic Efficiency . 456
 4. AcquiescencebyReenactment Argument ................... 457
 D. Conclusion 459
 IV. THE PUBLIC OWNERSHIP RULE .......................................... 459
 A. The Statute .................................................. 459
 1. Statutory Language ..................................... 459
 2. Legislative History .................................... 460
 B. The Regulations and Accompanying Commentary .................. 460
 V. THE "COMMITTED USE" REQUIREMENT .................................... 461
 VI. THE HIERARCHY OF ASSESSMENT METHODS ................................ 462
 VII. THE TEN PERCENT DISCOUNT RATE ...................................... 464
VIII. THE ALLEGEDLY PREFERENTIAL TREATMENT OF PRPS ....................... 465
 A. Delegation of the Assessment Process to PRPs ................. 466
 1. Delegability of Assessment Tasks Generally ............. 466
 2. Specific Aspects of the Delegation Rule ................ 466
 B. Public Notice and Comment .................................... 467
 IX. LIMITATION ON RECOVERY OF ASSESSMENT COSTS ......................... 468
 X. THE ACCEPTANCE CRITERIA ............................................ 468
 A. The Regulations .............................................. 469
 B. Analysis ..................................................... 470
 1. CERCLA and the CommonLaw Causation Standard ........... 470
 2. The Reasonableness Test ................................ 472
 3. Noncompensability of General Studies ................... 473
 XI. AUDIT REQUIREMENTS ................................................. 473
 XII. PUNITIVE DAMAGES ................................................... 474
XIII. CONTINGENT VALUATION ............................................... 474
 A. The Regulatory Background .................................... 474
 B. Consistency With CERCLA ...................................... 476
 C. Presumption of Validity of CV Assessments .................... 478
 XIV. CONCLUSION ......................................................... 481
 WALD, Chief Judge, and SPOTTSWOOD W. ROBINSON III and MIKVA, Circuit Judges:[1]
 
 
 1
 Petitioners are 10 states, three environmental organizations ("State and Environmental Petitioners"), a chemical industry trade association, a manufacturing company and a utility company ("Industry Petitioners"), who seek review of regulations promulgated by the Department of the Interior ("DOI" or "Interior") pursuant to Sec. 301(c)(1)-(3) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA" or the "Act"), as amended, 42 U.S.C. Sec. 9651(c). The regulations govern the recovery of money damages from persons responsible for spills and leaks of oil and hazardous substances, to compensate for injuries such releases inflict on natural resources.[2] Damages may be recovered by state and in some cases the federal governments, as trustees for those natural resources.
 
 
 2
 Petitioners challenge many aspects of those regulations. State and Environmental Petitioners raise ten issues, all of which essentially focus on the regulations' alleged undervaluation of the damages recoverable from parties responsible for hazardous materials spills that despoil natural resources. Industry Petitioners attack the regulations from a different vantage point, claiming they will permit or encourage overstated damages. In addition, three public interest organizations ("Environmental Intervenors") defend the regulations from the attacks of Industry Petitioners, and a collection of corporations and industry groups ("Industry Intervenors") defend the regulations from the attacks of State and Environmental Petitioners.
 
 
 3
 We hold that the regulation limiting damages recoverable by government trustees for harmed natural resources to "the lesser of" (a) the cost of restoring or replacing the equivalent of an injured resource, or (b) the lost use value of the resource is directly contrary to the clearly expressed intent of Congress and is therefore invalid. We also hold that the regulation prescribing a hierarchy of methodologies by which the lost-use value of natural resources may be measured, which focuses exclusively on the market values for such resources when market values are available, is not a reasonable interpretation of the statute. We remand the record to DOI for a clarification of its interpretation of its own regulations concerning the applicability of the CERCLA natural resource damage provisions to privately owned land that is managed or controlled by a federal, state or local government. We reject all other challenges to Interior's regulations.
 
 I. BACKGROUND
 A. Statutory Background
 
 4
 CERCLA, popularly known as Superfund, was enacted in 1980. Pub.L. No. 96-510, 94 Stat. 2767 (1980). Congress amended it in 1986, in the Superfund Amendments and Reauthorization Act ("SARA"), Pub.L. No. 99-499, 100 Stat. 1613 (1986). Unless otherwise specified, references to CERCLA in this opinion refer to the statute as amended.
 
 
 5
 CERCLA furnishes the executive branch with the authority to respond to actual and threatened releases of "hazardous substance[s]" and "pollutant[s] or contaminant[s]." Sec. 104(a)(1), 42 U.S.C. Sec. 9604(a)(1). Response actions may include both "removal" (i.e., cleanup of the spilled substance) and "remedial action" (e.g., dredging, repair of leaking containers, collection of rainfall runoff, relocation of displaced residents). Sec. 101(23)-(25), 42 U.S.C. Sec. 9601(23)-(25). CERCLA established the Superfund as a source of expeditious payment for response actions, although ultimately the liability for response costs is placed on specified classes of responsible parties: past and present owners and operators of vessels and facilities; waste generators or other persons who arranged for disposal, treatment or transport of hazardous substances; and transporters of hazardous substances. Secs. 111(a)(1), 107(a), 42 U.S.C. Secs. 9611(a)(1), 9607(a). Responsible parties may be required to pay the response costs or, in some cases, to perform the response actions themselves. Secs. 106(a), 107(a)(A)-(B), 42 U.S.C. Secs. 9606(a), 9607(a)(A)-(B).
 
 
 6
 The relevant provisions of CERCLA in this case, however, go beyond the mere removal or remedying of spills. CERCLA provides that responsible parties may be held liable for "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release." Sec. 107(a)(C), 42 U.S.C. Sec. 9607(a)(C). Liability is to "the United States Government and to any State for natural resources within the State or belonging to, managed by, controlled by, or appertaining to such State." Sec. 107(f)(1), 42 U.S.C. Sec. 9607(f)(1).[3] The Act provides for the designation of federal and state "trustees" who are authorized to assess natural resource damages and press claims for the recovery of such damages, both under CERCLA and under Sec. 311 of the Federal Water Pollution Control Act (commonly referred to as the "Clean Water Act"), 33 U.S.C. Sec. 1321. CERCLA Sec. 107(f)(2), 42 U.S.C. Sec. 9607(f)(2).
 
 
 7
 Congress conferred on the President (who in turn delegated to Interior) the responsibility for promulgating regulations governing the assessment of damages for natural resource injuries resulting from releases of hazardous substances or oil, for the purposes of CERCLA and the Clean Water Act's Sec. 311(f)(4)-(5) oil and hazardous substance natural resource damages provisions, 33 U.S.C. Sec. 1321(f)(4)-(5). These regulations originally were required to be in place by December 1982. Sec. 301(c), 42 U.S.C. Sec. 9651(c). CERCLA prescribed the creation of two types of procedures for conducting natural resources damages assessments. The regulations were to specify (a) "standard procedures for simplified assessments requiring minimal field observation" (the "Type A" rules), and (b) "alternative protocols for conducting assessments in individual cases" (the "Type B" rules). Sec. 301(c)(2), 42 U.S.C. Sec. 9651(c)(2). Both the Type A and the Type B rules were to "identify the best available procedures to determine such damages." Id. The regulations must be reviewed and revised as appropriate every two years. Sec. 301(c)(3), 42 U.S.C. Sec. 9651(c)(3). Under the Act, a trustee seeking damages is not required to resort to the Type A or Type B procedures, but CERCLA as amended provides that any assessment performed in accordance with the prescribed procedure is entitled to a rebuttable presumption of accuracy in a proceeding to recover damages from a responsible party. Sec. 107(f)(2)(C), 42 U.S.C. Sec. 9607(f)(2)(C).
 
 
 8
 In August 1986, Interior published a final rule containing the Type B regulations for natural resource damage assessments, the subject of this lawsuit. Shortly thereafter, in October 1986, Congress adopted SARA, amending the natural resources damages provisions of CERCLA in several respects. For example, SARA provided that assessments performed by state as well as federal trustees were entitled to a rebuttable presumption, it provided for the recovery of prejudgment interest on damage awards, and it proscribed "double recovery" for natural resources damages. Secs. 107(f)(2)(C), 107(a), 107(f)(1), 42 U.S.C. Secs. 9607(f)(2)(C), 9607(a), 9607(f)(1). SARA also amended Sec. 301(c) to require Interior to adopt any necessary conforming amendments to its natural resource damage assessment regulations within six months of the effective date of the amendments, "[n]otwithstanding the failure of the President to promulgate the regulations required under this subsection on the required [December 1982] date." Sec. 301(c)(1), 42 U.S.C. Sec. 9651(c)(1).
 
 
 9
 B. The Natural Resource Damage Assessment Regulations
 
 
 10
 Interior's response to its assigned task of promulgating regulations for assessing natural resource damages was, to put it charitably, relaxed. In January 1983, after the original statutory deadline had come and gone, Interior issued an advance notice of proposed rulemaking soliciting comments from the public on how to approach the development of the regulations. 48 Fed.Reg. 1,084 (1983). A second advance notice of proposed rulemaking seven months later summarized the comments received in response to the first notice. 48 Fed.Reg. 34,768 (1983). More than a year later, in January 1985, Interior published a notice inviting more public comments and suggesting meetings with interested members of the public. 50 Fed.Reg. 1,550 (1985).
 
 
 11
 In December 1985, five years after the enactment of CERCLA and three years after the statutory deadline, Interior published a proposed rule setting out (a) regulations concerning the assessment process generally (applicable to both Type A and Type B assessments) and (b) Type B rules in particular. 50 Fed.Reg. 52,126 (1985). A comment period originally set at 45 days was later extended an additional 15 days. 50 Fed.Reg. at 52,126; 51 Fed.Reg. 4,397 (1986).
 
 
 12
 Ultimately, on August 1, 1986, Interior published a final rule containing general natural resource damage assessment regulations as well as the Type B rules challenged in the present case. 51 Fed.Reg. 27,674 (1986) (codified at 43 C.F.R. Secs. 11.10-11.93 (1987)).
 
 
 13
 The assessment process established by the Type B regulations has four phases. In the "preassessment phase," a trustee that has become aware of a release of hazardous substances or oil makes an initial determination whether natural resources may have been affected. If further action is deemed warranted, the trustee enters the "assessment plan phase," in which an assessment strategy is mapped out. Next comes the "assessment phase," in which the trustee establishes whether there was in fact an injury to natural resources, quantifies the extent of the injury, and ascertains the appropriate dollar-amount of damages caused by the release. Finally, in the "post-assessment phase," the trustee assembles a report documenting the assessment process and presents the responsible party with a demand for payment of damages. See 51 Fed.Reg. at 27,726-27.
 
 
 14
 The August 1986 regulations were promptly challenged by state governments, environmental groups, industrial corporations and an industry group.
 
 
 15
 Shortly after the issuance of the August 1986 regulations, Congress amended CERCLA by enacting SARA. As noted above, SARA gave Interior six months in which to conform its natural resource damage assessment rules to the amended statute. In response to SARA, Interior issued revised rules (following notice and comment) in February 1988. 53 Fed.Reg. 5,166 (1988). A state government and an environmental group filed additional challenges to these revised rules, which this court consolidated with the original case.
 
 
 16
 Interior's formulation of Type A rules (governing simplified damage assessments) was handled in a separate rulemaking proceeding. Following notice and comment, a set of Type A rules was issued as a final rule in March 1987. 52 Fed.Reg. 9,042 (1987). The Type A rules are the subject of a separate petition for review, which was briefed and argued simultaneously with the present case and is decided today in State of Colorado v. Department of the Interior, 880 F.2d 481 (D.C.Cir. 1989).II. STANDARD OF REVIEW
 
 
 17
 In reviewing an agency's interpretation of a statute, we first determine "whether Congress has directly spoken to the precise question at issue." Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). If so, then both Interior and this court "must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781; accord NLRB v. United Food & Comm'l Workers Union Local 23, 484 U.S. 112, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987). This is "Step One" of Chevron analysis.
 
 
 18
 Whether Congress has made its intent clear and unambiguous does not depend on whether a particular phrase of the statutory text standing all alone resolves the matter. Rather, the court must look beyond "the particular statutory language at issue" and examine "the language and design of the statute as a whole." K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988). "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." Davis v. Michigan Dept. of Treasury, --- U.S. ----, 109 S.Ct. 1500, 1504, 103 L.Ed.2d 891 (1989). Moreover, as the Supreme Court indicated in Chevron and has reiterated since then, the reviewing court must "employ[ ] traditional tools of statutory construction"--including, when appropriate, legislative history--to determine whether Congress "had an intention on the precise question at issue." Chevron, 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9; accord United Food & Comm'l Workers Union, 108 S.Ct. at 421; INS v. Cardoza-Fonseca, 480 U.S. 421, 446-48, 107 S.Ct. 1207, 1220-22, 94 L.Ed.2d 434 (1987). If the court, having studied the statutory text, structure and history, is left with the unmistakable conclusion that Congress had an intention on the precise question at issue, "that intention is the law and must be given effect." Chevron, 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9.
 
 
 19
 If, on the other hand, the statute is ambiguous or is silent on a particular issue, this court must assume that Congress implicitly delegated to the agency the power to make policy choices that " 'represent[ ] a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute.' " Chevron, 467 U.S. at 844-45, 104 S.Ct. at 2783, quoting United States v. Shimer, 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961). In that event, the court must defer to the agency's interpretation of the statute so long as it is reasonable and consistent with the statutory purpose. Id. This is "Step Two" of Chevron analysis.
 
 
 20
 We first take up the ten issues raised by State and Environmental Petitioners, followed by the one issue raised by Industry Petitioners.
 
 III. THE "LESSER-OF" RULELE
 
 21
 The most significant issue in this case concerns the validity of the regulation providing that damages for despoilment of natural resources shall be "the lesser of: restoration or replacement costs; or diminution of use values." 43 C.F.R. Sec. 11.35(b)(2) (1987) (emphasis added).
 
 
 22
 State and Environmental Petitioners challenge Interior's "lesser of" rule, insisting that CERCLA requires damages to be at least sufficient to pay the cost in every case of restoring, replacing or acquiring the equivalent of the damaged resource (hereinafter referred to shorthandedly as "restoration"). Because in some--probably a majority of--cases lost-use-value will be lower than the cost of restoration, Interior's rule will result in damages award too small to pay for the costs or restoration. Petitioners point to a section of CERCLA providing that recovered damages must be spent only on restoration as evidence that Congress intended restoration cost-based damages to be the norm. As further proof of such a norm, the same section goes on to state that the measure of damages "shall not be limited by" the sums which can be used for restoration. Petitioners maintain that the "shall not be limited by" language clearly establishes restoration costs as a "floor" measure of damages. Petitioners also rely on the legislative history of CERCLA and of SARA, claiming that it reinforces the sense of the text and documents Congress' primary emphasis on restoration of natural resources. In particular, they point to a House report on SARA, insisting that it, together with the other statutory indicators, proves conclusively that Congress intended restoration costs to be a minimum measure of damages in natural resource cases.
 
 
 23
 Interior defends its rule by arguing that CERCLA does not prescribe any floor for damages but instead leaves to Interior the decision of what the measure of damages will be. DOI acknowledges that all recovered damages must be spent on restoration but argues that the amount recovered from the responsible parties need not be sufficient to complete the job. DOI suggests two alternative meanings of the "shall not be limited by" phrase that do not construe it as a damages floor. Finally, DOI argues that the legislative history, like the statutory text, is ambiguous and that Interior's rule for measuring damages is a reasonable one.
 
 
 24
 Although our resolution of the dispute submerges us in the minutiae of CERCLA text and legislative materials, we initially stress the enormous practical significance of the "lesser of" rule. A hypothetical example will illustrate the point: imagine a hazardous substance spill that kills a rookery of fur seals and destroys a habitat for seabirds at a sealife reserve. The lost use value of the seals and seabird habitat would be measured by the market value of the fur seals' pelts (which would be approximately $15 each)[4] plus the selling price per acre of land comparable in value to that on which the spoiled bird habitat was located.[5] Even if, as likely, that use value turns out to be far less than the cost of restoring the rookery and seabird habitat, it would nonetheless be the only measure of damages eligible for the presumption of recoverability under the Interior rule.
 
 
 25
 After examining the language and purpose of CERCLA, as well as its legislative history, we conclude that Interior's "lesser of" rule is directly contrary to the expressed intent of Congress.
 
 
 26
 A. The Contours of "the Precise Question at Issue"
 
 
 27
 Commencing our Chevron analysis, we must first decide exactly what "the precise question at issue" is in the present case. Chevron, 467 U.S. at 842, 104 S.Ct. at 2781. Much depends on accurately identifying that issue so as to decide whether Congress has "directly spoken" on it; if so, under Chevron 's "Step One" we must give effect to that unambiguously expressed intent. If not, we proceed instead to "Step Two" and determine whether Interior's construction of CERCLA is reasonable and consistent with the statutory purpose.
 
 
 28
 State and Environmental Petitioners posit that the precise question at issue in this case is what measure of damages must be applied in natural resource damage actions. They argue that Congress did address the precise question at issue by deciding that damages must at a minimum encompass the full cost of restoration in every case. See Pet. Br. 18-22. Therefore, petitioners say, this court must strike down the "lesser of" rule on Chevron Step One grounds.
 
 
 29
 Interior also assumes that the precise question at issue here is what measure of damages must be applied in natural resource damage actions. Interior's position, however, is that Congress did not definitively address that question. See Resp. Br. 25-27; 51 Fed.Reg. 27,705. To support this view, Interior points out that Congress did not choose a particular measure of damages, opting instead to authorize the President to draft regulations governing the assessment of damages. Sec. 301(c)(2), 42 U.S.C. Sec. 9651(c)(2) (regulations shall "identify the best available procedures to determine ... damages" and shall "take into consideration" certain listed factors, among others). Since Congress delegated the matter to the President (who turned it over to DOI), DOI argues that this case is governed by Chevron Step Two and that its "lesser of" rule must be upheld if not unreasonable or inconsistent with the statutory purpose.
 
 
 30
 We find both parties' arguments flawed in one important respect. Both fail to properly describe the "precise question at issue" in the "lesser-of" rule. That question is not what measure of damages should apply in any or all cases which are brought under the Act. As to that larger question, Interior is obviously correct in asserting that Congress delegated to it a considerable measure of discretion in formulating a standard. See Sec. 301(c)(2), 42 U.S.C. Sec. 9651(c)(2). The precise question here is a far more discrete one: whether DOI is entitled to treat use value and restoration cost as having equal presumptive legitimacy as a measure of damages.[6]
 
 
 31
 Interior's "lesser of" rule operates on the premise that, as the cost of a restoration project goes up relative to the value of the injured resource, at some point it becomes wasteful to require responsible parties to pay the full cost of restoration. See 51 Fed.Reg. at 27,704-05; 50 Fed.Reg. at 52,141. The logic behind the rule is the same logic that prevents an individual from paying $8,000 to repair a collision-damaged car that was worth only $5,000 before the collision. Just as a prudent individual would sell the damaged car for scrap and then spend $5,000 on a used car in similar condition, DOI's rule requires a polluter to pay a sum equal to the diminution in the use value of a resource whenever that sum is less than restoration cost. What is significant about Interior's rule is the point at which it deems restoration "inefficient." Interior chose to draw the line not at the point where restoration becomes practically impossible, nor at the point where the cost of restoration becomes grossly disproportionate to the use value of the resource, but rather at the point where restoration cost exceeds--by any amount, however small--the use value of the resource. Thus, while we agree with DOI that CERCLA permits it to establish a rule exempting responsible parties in some cases from having to pay the full cost of restoration of natural resources,[7] we also agree with Petitioners that it does not permit Interior to draw the line on an automatic "which costs less" basis.
 
 
 32
 Interior's "lesser of" rule squarely rejects the concept of any clearly expressed congressional preference for recovering the full cost of restoration from responsible parties. The challenged regulation treats the two alternative measures of damages, restoration cost and use value, as though the choice between them were a matter of complete indifference from the statutory point of view: thus, in any given case, the rule makes damages turn solely on whichever standard is less expensive. (An analogy would be a government procurement rule that dictated the purchase of the lowest-priced goods, regardless of whether they were domestically made or imported.) If Congress, however, in enacting CERCLA, clearly expressed an intention that DOI's damage measurement rules incorporate a distinct preference for restoration cost over use value, then the "lesser of" rule is inconsistent with that intent. Congress' expressed preference would mean that restoration cost must normally be preferred over use value despite use value being the "lesser" figure, except in unusual situations where the disadvantages or expenses were extreme. (Returning to our analogy, the lowest-price procurement rule would be invalid under Chevron Step One if it were promulgated under a statute clearly mandating a preference for domestic goods.). Based on the discussion that follows, we conclude that CERCLA unambiguously mandates a distinct preference for using restoration cost as the measure of damages, and so precludes a "lesser of" rule which totally ignores that preference.
 
 B. Text and Structure of CERCLA
 
 33
 CERCLA provides that parties responsible for hazardous substance releases "shall be liable for ... damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release." Sec. 107(a)(C), 42 U.S.C. Sec. 9607(a)(C). The Regulations promulgated pursuant to Sec. 107(a)(C) are to identify procedures for measuring damages that "shall take into consideration factors including, but not limited to, replacement value, use value, and ability of the ecosystem or resource to recover." Sec. 301(c)(2), 42 U.S.C. Sec. 9651(c)(2). While CERCLA thus empowers DOI to formulate a measure of damages, several other provisions of the Act make it clear that replacement cost and use value are not to be accorded equal presumptive legitimacy in the process.
 
 
 34
 1. Section 107(f)(1) and the Measure of Damages
 
 
 35
 The strongest linguistic evidence of Congress' intent to establish a distinct preference for restoration costs as the measure of damages is contained in Sec. 107(f)(1) of CERCLA. That section states that natural resource damages recovered by a government trustee are "for use only to restore, replace, or acquire the equivalent of such natural resources." 42 U.S.C. Sec. 9607(f)(1). It goes on to state: "The measure of damages in any action under [Sec. 107(a)(C) ] shall not be limited by the sums which can be used to restore or replace such resources." Id.[8]
 
 
 36
 a. Limitation on Uses of Recovered Damages
 
 
 37
 By mandating the use of all damages to restore the injured resources, Congress underscored in Sec. 107(f)(1) its paramount restorative purpose for imposing damages at all. It would be odd indeed for a Congress so insistent that all damages be spent on restoration to allow a "lesser" measure of damages than the cost of restoration in the majority of cases. Only two possible inferences about congressional intent could explain the anomaly: Either Congress intended trustees to commence restoration projects only to abandon them for lack of funds, or Congress expected taxpayers to pick up the rest of the tab. The first theory is contrary to Congress' intent to effect a "make-whole" remedy of complete restoration,[9] and the second is contrary to a basic purpose of the CERCLA natural resource damage provisions--that polluters bear the costs of their polluting activities.[10] It is far more logical to presume that Congress intended responsible parties to be liable for damages in an amount sufficient to accomplish its restorative aims. Interior's rule, on the other hand, assumes that Congress purposely formulated a statutory scheme that would doom to failure its goals of restoration in a majority of cases.[11]
 
 
 38
 In this connection, it should be noted that Interior makes no claim that a "use value" measure will provide enough money to pay for any of the three uses to which all damages must be assigned: restoration, replacement or acquisition of an equivalent resource. Nor could Interior make such a claim, because its "lesser of" rule not only calculates use value quite differently from restoration or replacement cost but it also fails to link measurement of use value in any way to the cost of acquiring an equivalent resource. For example, Interior could not possibly maintain that recovering $15 per pelt for the fur seals killed by a hazardous substance release would enable the purchase of an "equivalent" number of fur seals.
 
 
 39
 b. The "Shall Not Be Limited By" Language
 
 
 40
 The same section of CERCLA that mandates the expenditures of all damages on restoration (again a shorthand reference to all three listed uses of damages) provides that the measure of damages "shall not be limited by" restoration costs. Sec. 107(f)(1), 42 U.S.C. Sec. 9607(f)(1). This provision obviously reflects Congress' apparent concern that its restorative purpose for imposing damages not be construed as making restoration cost a damages ceiling.[12] But the explicit command that damages "shall not be limited by" restoration costs also carries in it an implicit assumption that restoration cost will serve as the basic measure of damages in many if not most CERCLA cases. It would be markedly inconsistent with the restorative thrust of the whole section to limit restoration-based damages, as Interior's rule does, to a minuscule number of cases where restoration is cheaper than paying for lost use.[13]
 
 
 41
 2. Interior's Reading of CERCLA Secs. 301 and 107
 
 
 42
 In the face of Sec. 107's clear preference for restoration as the basic measure of natural resource damages, DOI and Industry Intervenors advance "ambiguities" in the language of Secs. 301 and 107, asserting that those ambiguities are sufficient to permit Interior to promulgate the "lesser of" rule under Chevron Step Two.
 
 
 43
 a. The "Take Into Consideration" Language
 
 
 44
 First, Interior argues that the "take into consideration" language of Sec. 301(c)(2) delegates to Interior the decision of whether and how restoration cost should be taken into consideration. Resp. Br. 25-27; 51 Fed.Reg. 27,70 5. We have acknowledged that CERCLA does confer on DOI discretion in fashioning the measure of damages; indeed, if Sec. 301(c)(2) were the only instruction Congress had given, DOI's argument would be a strong one. But the reality is that Interior's discretion is cabined by Congress' determination, as evidenced by the statutory text discussed above, that the measure of damages reflect a preference for restoration cost, at least where restoration is feasible and can be performed at a cost not grossly disproportionate to the use value of the resource. Thus, while DOI is correct in pointing to the "take into consideration" language as hinting at a measure of latitude on the part of DOI, the degree of latitude conferred by Congress is not infinite.
 
 
 45
 b. The Assessment Costs Language
 
 
 46
 Industry Intervenors argue that the reference in Sec. 107(a)(C) to including assessment costs in damages awards indicates, by the principle of expressio unius est exclusio alterius, that Congress intended only the one narrow departure from common-law damage measurement standards.[14] But this crabbed reading ignores the existence of Sec. 301(c)(2), which states that the factors to be taken into account by the regulations "includ[e] but [are] not limited to" replacement cost and use value. Under the common law, the Industry Intervenors would have us believe, there are no other factors to consider. In light of Sec. 301(c)(2), the expressio unius argument, at best a canon for construing statutes in the absence of more definite guidance within the four corners of the act itself, loses force. We do not think Congress' mere mention of assessment costs in Sec. 107(a)(C) implicitly excludes all other non-common-law components of damages.
 
 
 47
 c. The "Shall Not Be Limited By" Language
 
 
 48
 Interior and Industry Intervenors propose several alternative readings of the "shall not be limited by" language of Sec. 107(f)(1) in an effort to show that Congress did not unambiguously express a preference for restoration cost as the basic measure of CERCLA natural resource damages. None of their various constructions is plausible, however.
 
 
 49
 They first contend that the phrase "shall not be limited by" dictates not the measure of damages but the uses to which damages must be put. Industry Intervenors argue that Congress' "primary purpose" in this portion of Sec. 107(f) was "to describe the appropriate uses of the natural resource damages once they are recovered, while making sure that section 107(f) did not contradict the scope of recovery set forth in section 107(a)(C)." Ind. Int. Br. 16 (emphasis in original). This is a difficult argument to understand, let alone accept. First, the notion that a sentence beginning with the words, "The measure of damages ... shall ..." refers only to the uses of damages rather than the proper measure of damages is counterintuitive, especially when the sentence immediately preceding it expressly refers to the uses of damages. Second, we fail to see why Congress need be concerned that Sec. 107(f)(1) would "contradict the scope of recovery set forth in" Sec. 107(a)(C). The latter section simply imposes liability for "damages" for injury or loss to natural resources (including assessment costs). Any conflict with subsection (f)(1) is of Industry's own making; it arises only if, as Industry does, one reads a common-law limitation into the word "damages." See supra note 14. The whole argument strikes us as circular. Indeed, the fact that subsection (f)(1) itself explicitly cross-references subsection (a)(C) as the source of liability indicates Congress' conscious design to read the two subsections as compatible and complementary: liability for "damages" is established in subsection (a)(C), while subsection (f)(1) orders DOI not to place a restoration-cost ceiling on the "measure of damages." Industry Intervenors' caution that subsection (f)(1) should not be read "to supplant the measure of damages established in" subsection (a)(C), Ind. Int. Br. 17, is superfluous: subsection (a)(C) does not purport to set a measure of damages, while subsection (f)(1) contains an explicit command regarding "[t]he measure of damages in any action under" subsection (a)(C).[15]
 
 
 50
 Alternatively, DOI and Industry Intervenors propose two readings of the phrase "shall not be limited by," both of which negate restoration costs as the preferred measure of damages.
 
 
 51
 First, they suggest that the phrase means that damages need not be measured by restoration costs at all; a different measure, i.e., lost use value, is perfectly acceptable under appropriate circumstances. See 51 Fed.Reg. at 27,704-05. This reading, however, seems strained and does not accord with the usual meaning of the phrase "shall not be limited by." Its implausibility is even more obvious from context. The relevant passage reads as follows:
 
 
 52
 Sums recovered by a State as trustee under this subsection shall be available for use only to restore, replace, or acquire the equivalent of such natural resources by the State. The measure of damages in any action under subparagraph (C) of subsection (a) of this section shall not be limited by the sums which can be used to restore or replace such resources.
 
 
 53
 Sec. 107(f)(1), 42 U.S.C. Sec. 9607(f)(1). Plainly, the statute lists three legitimate uses of the money (restoration, replacement, or acquisition of an equivalent resource) and then states that the measure of damages shall not be limited by the amount of the first two listed purposes. This context makes it obvious that Sec. 107(f)(1)'s "shall not be limited by" language was not designed to afford DOI the liberty of mandating a lesser measure of damages in all or most cases; rather, the measure of damages must not only be sufficient to cover the intended restoration or replacement uses in the usual case but may in some cases exceed restoration cost by incorporating interim lost use value as well.[16]
 
 
 54
 Interior posits still another reading of the "shall not be limited by" phrase: when restoration cost is used as the basic measure of damages, it is not to be a "ceiling" on damages. Interior's regulations incorporate this view: one regulation provides that, "[i]f restoration or replacement is to form the basis of the measure of damages, the diminution of use values during the period of time required to obtain restoration or replacement may also be included in the measure of damages." 43 C.F.R. Sec. 11.84(g)(1). It seems strange, however, that Congress would single out one alternative measure of damages (restoration costs) and legislate specially to insure that interim use value damages would be added to it, at the same time it was content to let DOI set damages at the lowest amount calculable by any acceptable standard. The absurdity of this reading surfaces when we consider what happens when use value weighs in at a lower cost than restoration, say $4 million versus $5 million. Use value is used exclusively, and damages are set at $4 million. But if restoration should weigh in at $3 million, damages can include additional millions for interim lost use, bringing the total beyond the $4 million figure. See 43 C.F.R. Sec. 11.84(g)(1). Surely Congress had no such mischievous result in mind.
 
 
 55
 Ultimately, notwithstanding Interior's and Industry's attempts to generate "ambiguities" in the statutory text, Sec. 107(f)(1) of CERCLA evinces a clear congressional intent to make restoration costs the basic measure of damages.
 
 3. Superfund Provisions
 
 56
 CERCLA's Superfund provisions lend additional weight to our conclusion that Interior's "lesser of" rule is not true to the statute. In CERCLA as originally enacted, public trustees could rely on Superfund money to pay for restoration in cases where they could not recover money from the polluters themselves (for example, where the responsible party had become insolvent, or where the responsible party had engaged in secret dumping and thus could not be identified).[17] SARA cut off the availability of Superfund money for natural resource restoration in 1986,[18] but the statutory provisions governing Superfund remain on the books and provide evidence of Congress' intent to require responsible parties to pay restoration costs. Under CERCLA, Superfund monies can be spent to redress harm to natural resources only to (1) assess the extent of the damages, and to (2) finance government trustees' "efforts in the restoration, rehabilitation, or replacement or acquiring the equivalent of any natural resources injured, destroyed, or lost as a result of a release of a hazardous substance." Sec. 111(c)(1)-(2), 42 U.S.C. Sec. 9611(c)(1)-(2). The statute, though, bars a trustee from obtaining Superfund money until it has first "exhausted all administrative and judicial remedies to recover the amount of such claim from persons who may be liable" under Sec. 107 as responsible parties. Sec. 111(b)(2)(A), 42 U.S.C. Sec. 9611(b)(2)(A) (emphasis added). Interior's "lesser of" rule, however, means that in the majority of cases, the trustee cannot "recover the amount of such claim" from the responsible parties since use-based damages will be less.[19] So once again, Interior's rule appears to be out of sync with the statutory scheme and with CERCLA's decided emphasis on making polluters pay for restoration of spoiled resources.
 
 4. Settlement Provision
 
 57
 CERCLA's settlement provision provides that a federal trustee may settle a natural resource damages case only "if the potentially responsible party agrees to undertake appropriate actions necessary to protect and restore the natural resources damaged by [the] release or threatened release of hazardous substances." Sec. 122(j)(2), 42 U.S.C. Sec. 9622(j)(2). Interior's "lesser of" rule is out of step with this settlement provision as well: taken together, they establish a ragged-edged scheme whereby a responsible party can settle only if it pays restoration costs, but those restoration costs will usually be more than it stands to lose by trying the case, if damages are awarded in court under the "lesser of" rule. Normally, a rational polluter would not settle for an amount larger than its potential liability.[20] Thus, we should be reluctant to attribute to Congress a Machiavellian intent to allow Interior to undermine its own settlement provision. The fact that Congress insisted on restoration costs as a floor for settlements shows it must have intended a similar measure of damages to operate in the litigation itself.[21]
 
 5. Double Recovery Provision
 
 58
 Section Sec. 107(f)(1) provides that there shall be no "double recovery" against a responsible party, for "natural resource damages, including the costs of damage assessment or restoration, rehabilitation, or acquisition." 42 U.S.C. Sec. 9607(f)(1). This statutory language is yet another indication that Congress considered "recovery" for "natural resource damages" to "includ[e] the costs of ... restoration, rehabilitation, or acquisition."
 
 6. CERCLA and the Clean Water Act
 
 59
 The "lesser of" rule is also inconsistent with Sec. 311(f)(4) and (5) of the Clean Water Act, to which Interior's natural resource damage regulations are applicable in accordance with Sec. 301(c)(1) of CERCLA. Section 311 of the Clean Water Act provides that damages recoverable for releases of hazardous substances or oil covered by the CWA "shall include any costs or expenses incurred by the Federal Government or any State government in the restoration or replacement of natural resources damaged or destroyed." 33 U.S.C. Sec. 1321(f)(5).[22] Thus, the CWA expressly establishes restoration cost as the standard measure of damages.[23]
 
 
 60
 Interior nonetheless takes the position that its "lesser of" rule promulgated under CERCLA trumps the CWA standard. DOI points to Sec. 304(c) of CERCLA, which states that "[i]n any case in which any provision of section 311 of the [CWA] is determined to be in conflict with any provisions of [CERCLA], the provisions of [CERCLA] shall apply." 42 U.S.C. Sec. 9654(c). Interior's position of course assumes a conflict between the two statutes. We perceive none; quite the contrary. The CWA provides that damages must "include" restoration cost, while CERCLA provides that recovered sums must be spent on restoration and "shall not be limited by" restoration cost. These directives are in harmony: restoration is the basic measure of damages, but damages can exceed restoration cost in some cases. A compatible reading of the two statutes reinforces our view that restoration costs were the intended basis for damages in CERCLA and that there is no authorization for DOI to abandon Congress' strong preference for restoration, clearly expressed in two separate statutes enacted within three years of one another.
 
 C. Legislative History of CERCLA
 
 61
 The text and structure of CERCLA indicate clearly to us that Congress intended restoration costs to be the basic measure of recovery for harm to natural resources. We next examine the legislative history of CERCLA to ascertain if there are any countervailing indications to our conclusion and also to check on Interior's assertions that certain parts of the history are inconsistent with our conclusion and so render the statute ambiguous within the meaning of Chevron. Far from finding these arguments persuasive, we conclude that the legislative history of CERCLA--both in its original enactment in 1980 and in its amendment and reenactment in 1986--reinforces our interpretation of the text.
 
 1. The Enactment of CERCLA in 1980
 
 62
 The legislative history of CERCLA confirms that restoration costs were intended to be the presumptive measure of recovery. Senate proponents of the legislation, in the committee report[24] and on the Senate floor,[25] repeatedly emphasized that their primary objective in assessing damages for public resources was to achieve restoration.[26]
 
 
 63
 The history of the damages provision of CERCLA documents further Congress' intent to broaden government trustees' recovery beyond lost use value. As reported to the Senate floor, CERCLA's forerunner, S. 1480, allowed recovery for, inter alia, the following three categories of damages:
 
 
 64
 (C) any injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss;
 
 
 65
 (D) any loss of use of any natural resources, without regard to the ownership or management of such resources;
 
 
 66
 (E) any loss of income or profits or impairment of earning capacity resulting from personal injury or from injury to or destruction of real or personal property or natural resources, without regard to the ownership of such property or resources....
 
 
 67
 S. 1480, 96th Cong., 2d Sess. Sec. 4(a)(2), reprinted in 1 Legislative History, supra note 19, at 487-88 (emphasis added). Although (D) and (E), which related to private party recovery, were later dropped from the bill, they evidence a sharp contrast with the language of (C), which governed recovery by public trustees (and which was retained in the enacted version of CERCLA).[27] Private parties could recover damages only for lost use values, but public trustees were to be allowed under the language of (C) to recover for the loss of the natural resources themselves, based presumably on some measure other than lost use.[28]
 
 
 68
 The draft of S. 1480 is even more instructive when viewed alongside the 1978 amendments to the Outer Continental Shelf Lands Act (OCSLA), from which the language of S. 1480 appears to have been borrowed. Section 303(a)(2) of OCSLA authorizes damage claims for, inter alia, the following:
 
 
 69
 (C) injury to, or destruction of, natural resources;
 
 
 70
 (D) loss of use of natural resources;
 
 
 71
 (E) loss of profits or impairment of earning capacity due to injury to, or destruction of, real or personal property or natural resources....
 
 
 72
 43 U.S.C. Sec. 1813(a)(2)(C)-(E). As was the case with the proposed version of CERCLA, OCSLA makes the damages under paragraph (C) available only to the federal or state governments, while (D) and (E) relate to private party recovery. OCSLA Sec. 303(b), 43 U.S.C. Sec. 1813(b). The legislative history of paragraph (C) of OCSLA makes it clear that restoration costs are the standard of recovery. See H.R.Rep. No. 590, 95th Cong., 1st Sess. 182 (1977), 1978 U.S.Code Cong. & Admin.News 1450, 1588 ("If natural resources are damaged or destroyed by an oil discharge, Federal or State governments may recover the costs and expenses of restoring, repairing, or replacing such resources."); see also H.R.Conf.Rep. No. 1474, 95th Cong., 2d Sess. 131 (1978), 1978 U.S.Code Cong. & Admin.News 1450, 1730.[29] Given the similarity between OCSLA and the CERCLA Sec. 107(a)(C) provision for recovery of "damages for injury to, destruction of, or loss of natural resources," Congress' use of restoration as the standard for damages under OCSLA provides further evidence that CERCLA likewise envisions restoration cost as the primary standard of recovery.
 
 
 73
 Interior, however, advances a supposed "ambiguity" in the legislative history of CERCLA. The 1980 Senate report on CERCLA contains the following statement:
 
 
 74
 The Committee received testimony indicating that both short- and long-term damages to natural resources resulted from releases of hazardous substances and that standardized techniques for assessing both the biological and economic damages from such releases should be developed. Testimony also indicated that it was appropriate and necessary for the State or in some instances the Federal Government acting as trustee for such resources to seek restitution for such damages or restoration of such resources.
 
 
 75
 S.Rep. No. 848, supra note 10, at 84 (emphasis added). Interior argues that the use of the word "or" in the italicized phrase indicates that Congress did not necessarily envision restoration costs as the basic measure of damages. Resp. Br. 29.
 
 
 76
 We see no basis for Interior's assumption that the word "restitution" is equivalent to "use value." Furthermore, we do not read the statute as mandating that restoration costs are the minimum measure in every natural resource case. We (though not petitioners) acknowledge some degree of latitude on the part of DOI to establish use value as the measure of damages in some class or classes of cases. The precise question before us is whether DOI can use the "lesser of" rule to decide when use value will be the chosen measure and when restoration costs will be chosen instead. The appearance of the word "or" in the Senate report is completely unresponsive to this issue.
 
 2. The Enactment of SARA in 1986
 
 77
 CERCLA's "shall not be limited by" language, its mandate that recovered funds be used solely for restoration activities, and the statements of its sponsors and supporters during its passage in 1980 all point in one direction: a distinct preference for restoration costs as the normative standard for damages. Congress' enactment of SARA in 1986 also provides strong evidence[30] that a restoration measure of damages was the statute's original intent. Of controlling importance in the SARA phase is a House report indicating that, while the "shall not be limited by" language of the original statute would be retained, Interior's demonstrated "confusion" about what that phrase meant[31] should be resolved in light of Congress' strong emphasis on restoration of resources.[32]
 
 
 78
 While not altering the relevant phrases of Sec. 107(f) in any basic way, SARA changed the permissible uses for damages from "restore, rehabilitate, or acquire the equivalent" to "restore, replace, or acquire the equivalent," in order to avoid the redundancy of "restore" and "rehabilitate," and to conform the exclusive use clause to the language of the "shall not be limited by" damages clause. See H.R.Rep. No. 253(IV), supra note 8, at 50 (emphasis added).[33]
 
 
 79
 In the accompanying Report of the House Committee on Merchant Marine and Fisheries, explicating how the new Sec. 107(f)(1) would work, its sponsors made their intent unmistakable that restoration costs were to be the preferred measure of damages. The committee report indicated that the "shall not be limited by" passage, while "essentially a restatement of the language of" the 1980 version, was aimed at ending what had been a "source of some confusion." H.R.Rep. No. 253(IV), supra note 8, at 50. "It is clear from [the] language [of Sec. 107(f)(1) ] that the primary purpose of the resource damage provisions of CERCLA is the restoration or replacement of natural resources damaged by unlawful releases of hazardous substances." Id. (emphasis added). Such an unequivocal statement of purpose is irreconcilable with DOI's "lesser of" rule, which would in a majority of cases risk underfunded, half-finished restoration projects.
 
 The same House report went on to explain:
 
 80
 [T]he final clause [dealing with use of damages to acquire a suitable equivalent resource] is necessary because a situation could arise in which the amount of damages caused by a release of hazardous substances is in excess of the amount that could realistically or productively be used to restore or replace those resources. That is, the total amount of damages may include the costs of restoration and the value of all the lost uses of the damaged resources ... from the time of the release up to the time of restoration. Since the damages contemplated by CERCLA include both, the total amount of damages recoverable would exceed the restoration costs alone.
 
 
 81
 The Committee therefore intends than [sic: probably should be "that"] any excess funds recovered shall be used, in such an instance, for the third purpose spelled out in the language of the amendment, which is to "acquire the equivalent of the damaged resource."
 
 
 82
 H.R.Rep. No. 253(IV), supra note 8, at 50 (emphasis added). The House report thus explicitly assumes that damages "contemplated by CERCLA" will normally include restoration costs at a minimum, plus interim lost-use value in appropriate cases.[34] (This House amendment to Sec. 107(f)(1) was adopted by the Conference Committee, H.R.Conf.Rep. No. 962, 99th Cong., 2d Sess. 204-05 (1986), and Representative Jones, a SARA sponsor, referred to H.R.Rep. No. 253(IV) as a good source of explanation for the SARA amendments. 132 Cong.Rec. H9612 (daily ed. Oct. 8, 1986).) In the face of this passage, the plausibility of the "lesser of" rule, which purposely allows damage recoveries to be set at an amount too small to accomplish restoration (or replacement or acquisition of an equivalent resource), becomes suspect indeed.
 
 
 83
 Interior's effort to discount the House report fails. Citing the passage quoted above, Interior states: "Although the report recognizes that damages measured might be found to exceed restoration costs, that does not mean that recovery should exceed restoration costs." Resp. Br. 33 (emphasis in original). We are at a loss to see how Interior can draw such a distinction between "damages" and "recovery" when the key phrase of the sentence is "damages recoverable."[35] In sum, Interior has not dissuaded us from the view that Congress in its 1986 SARA amendments to CERCLA reiterated its intention to make restoration costs the basic measure of recovery.[36]
 
 
 84
 SARA's legislative history also indicates that Congress consciously paralleled CERCLA's provision of Superfund monies for restoration activities and its imposition of liability on responsible parties to defray the expenses of those activities. A House report on SARA explicitly refers to Sec. 111(c)(2)'s provision for using Superfund monies as the model for Sec. 107(f)(1)'s limitation on the uses of recovered damages, noting:
 
 
 85
 This language [of Sec. 107(f)(1) ] is modeled after section 111(c)(2) of CERCLA ... but the money is recovered from the responsible party, not from the fund itself.
 
 
 86
 H.R.Rep. No. 253(IV), supra note 8, at 50.
 
 
 87
 If CERCLA's damages provision was expressly "modeled after" Superfund's provision allowing claims for restoration costs, the two provisions must incorporate similar theories of recovery. In sum, Interior's rule preventing government trustees from recovering the full cost of restoration clearly runs against the statutory grain.
 
 
 88
 3. Congress' Rejection of the Premises Underlying the "Lesser-Of" Rule
 
 
 89
 CERCLA's legislative history undergirds its textual focus on recovering restoration costs as the primary aim of the natural resource damages provisions. Furthermore, it shows that Congress soundly rejected the two basic premises underlying Interior's "lesser of" rule--first, that the common-law measure of damages is appropriate in the natural resource context, and second, that it is economically inefficient to restore a resource whose use value is less than the cost of restoration.
 
 
 90
 a. CERCLA and the Common-Law Measure of Damages
 
 
 91
 DOI and Industry Intervenors argue that Congress intended that damages under CERCLA would be calculated according to traditional common-law rules. Accepting for the sake of argument the contention that the "lesser of" rule reflects the common law,[37] support for the proposition that Congress adopted common-law damage standards wholesale into CERCLA is slim to nonexistent. DOI contends that Congress meant to adopt traditional methods of damage measurement, "[i]n the absence of clearly expressed Congressional intent to deviate from [the] common law rule." 51 Fed.Reg. at 27,705. The legislative history illustrates, however, that a motivating force behind the CERCLA natural resource damage provisions was Congress' dissatisfaction with the common law.[38] Indeed, one wonders why Congress would have passed a new damage provision at all if it were content with the common law.
 
 
 92
 Nor are we persuaded by Interior's reference to a colloquy on the Senate floor between Senator Simpson, a vocal opponent of CERCLA in committee who ultimately voted in favor of the bill, and Senator Stafford, a CERCLA sponsor. Senator Simpson stated: "I ... trust that the traditional legal rules for calculating of damages for injury in tort will be observed as part of cost effectiveness," citing as an example the measurement of damages as the lesser of lost use value or restoration cost. 126 Cong.Rec. 30,986 (1980). Interior quotes Senator Stafford as responding: "Yes, the Senator is correct." Resp. Br. 30. In all fairness, Interior's brief indicates by an ellipsis with the customary three dots that material between the query and the answer has been left out. The reality, however, is that in the interim Senator Simpson turned away from the measure-of-damages topic entirely and discussed in over 200 words an entirely unrelated provision of the statute before Senator Stafford said, "Yes, the Senator is correct," in response to a specific point on the unrelated topic. Based on what we read, there was no completed exchange between the two Senators on the subject at hand. In the face of Congress' stated dissatisfaction with the common law, Interior's reliance on this colloquy to justify its adherence to common-law damage measures is misplaced.
 
 
 93
 b. CERCLA and Economic Efficiency
 
 
 94
 Alternatively, Interior justifies the "lesser of" rule as being economically efficient. Under DOI's economic efficiency view, making restoration cost the measure of damages would be a waste of money whenever restoration would cost more than the use value of the resource. Its explanation of the proposed rules included the following statement:
 
 
 95
 [I]f use value is higher than the cost of restoration or replacement, then it would be more rational for society to be compensated for the cost to restore or replace the lost resource than to be compensated for the lost use. Conversely, if restoration or replacement costs are higher than the value of uses foregone, it is rational for society to compensate individuals for their lost uses rather than the cost to restore or replace the injured natural resource.
 
 
 96
 50 Fed.Reg. at 52,141. See also 51 Fed.Reg. at 27,704 ("lesser of" rule "promotes a rational allocation of society's assets").
 
 
 97
 This is nothing more or less than cost-benefit analysis: Interior's rule attempts to optimize social welfare by restoring an injured resource only when the diminution in the resource's value to society is greater in magnitude than the cost of restoring it. And, acknowledgedly, Congress did intend CERCLA's natural resource provisions to operate efficiently. For one thing, the Act requires that the assessment of damages and the restoration of injured resources take place as cost-effectively as possible.[39] Moreover, as we have indicated, there is some suggestion in the legislative history that Congress intended recovery not to encompass restoration cost where restoration is infeasible or where its cost is grossly disproportionate to use value. See supra note 7.
 
 
 98
 The fatal flaw of Interior's approach, however, is that it assumes that natural resources are fungible goods, just like any other, and that the value to society generated by a particular resource can be accurately measured in every case--assumptions that Congress apparently rejected. As the foregoing examination of CERCLA's text, structure and legislative history illustrates, Congress saw restoration as the presumptively correct remedy for injury to natural resources. To say that Congress placed a thumb on the scales in favor of restoration is not to say that it forswore the goal of efficiency. "Efficiency," standing alone, simply means that the chosen policy will dictate the result that achieves the greatest value to society. Whether a particular choice is efficient depends on how the various alternatives are valued. Our reading of CERCLA does not attribute to Congress an irrational dislike of "efficiency"; rather, it suggests that Congress was skeptical of the ability of human beings to measure the true "value" of a natural resource.[40] Indeed, even the common law recognizes that restoration is the proper remedy for injury to property where measurement of damages by some other method will fail to compensate fully for the injury.[41] Congress' refusal to view use value and restoration cost as having equal presumptive legitimacy merely recognizes that natural resources have value that is not readily measured by traditional means.[42] Congress delegated to Interior the job of deciding at what point the presumption of restoration falls away, but its repeated emphasis on the primacy of restoration rejected the underlying premise of Interior's rule, which is that restoration is wasteful if its cost exceeds--by even the slightest amount--the diminution in use value of the injured resource.
 
 4. Acquiescence-by-Reenactment Argument
 
 99
 DOI and Industry Intervenors argue finally that Congress' failure to amend the "shall not be limited by" language of Sec. 107(f)(1) in 1986 indicates that Congress acquiesced in Interior's "lesser of" rule. Concededly, Congress, in enacting SARA, amended Sec. 107(f)(1) of CERCLA without changing the "shall not be limited by" phrase, even after Interior published its initial formulation of the challenged "lesser of" rule. And there are indeed cases holding that reenactment of a statute without amendment implicitly ratifies the agency regulations issued under its auspices, so long as Congress evidenced its awareness of those regulations. See, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 382 n. 66, 102 S.Ct. 1825, 1841 n. 66, 72 L.Ed.2d 182 (1982); IBEW Local No. 474 v. NLRB, 814 F.2d 697, 711-12 (D.C.Cir.1987). Yet it is also true that the acquiescence-by-reenactment rule loses force where the regulations are found to have violated the clear terms of the statute to begin with. If, as we have concluded, CERCLA itself required the measure of damages to incorporate a distinct preference for restoration costs, and DOI's 1986 regulations ran contrary to that dictate, Congress' amendment of CERCLA later that year without modifying the statutory text in response to DOI's erroneous interpretation is not dispositive. As a general matter, we would be reluctant to hold that the failure to amend an already-clear statutory command generates "ambiguity" where none existed before.
 
 
 100
 But we need not decide that question as a general matter, because in the present case Congress did, in fact, respond to Interior's erroneous damage measure in a committee report, which expressed dissatisfaction with the "confusion" surrounding Sec. 107(f)(1) and reiterated that the "primary purpose" of CERCLA's natural resource damages provisions was restoration or replacement of natural resources. H.R.Rep. No. 253(IV), supra note 8, at 50; see also supra pp. 42-46. The report stated unequivocally that damages recoverable under CERCLA "include both" restoration cost and lost use value for the period between the spill and the completion of restoration. Id. Although Interior might argue from the report's description of Sec. 107(f)(1) as "the source of some confusion" that the House committee was acknowledging "ambiguity" within the meaning of Chevron, the report's vigorous and exasperated effort to put an end to the "confusion" once and for all accords more easily with our understanding (and Congress') that the 1980 version of CERCLA made the matter clear in the first place. Immediately following its "confusion" sentence, the report states that "[b]oth the amendment and the present language of CERCLA " require that recovered sums be spent on restoration, replacement, or acquisition of equivalent resources. Id. (emphasis added). The report continues: "It is clear from this language that the primary purpose of the resource damage provisions of CERCLA is the restoration or replacement of natural resources damaged by unlawful releases of hazardous substances." Id. (emphasis added). Thus, Congress apparently declined to amend the pertinent language of Sec. 107(f)(1) precisely because it deemed the language to have been clear all along. This view of Congress' 1986 mindset is consistent with the fact that no legislator even proposed a change in the relevant statutory language. DOI's acquiescence argument would not automatically prevail even if Congress had considered and rejected a SARA bill expressly overruling the "lesser of" regulation. See Firestone Tire & Rubber Co. v. Bruch, --- U.S. ----, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). Here, given that no such bill was ever introduced, the acquiescence argument is weaker still. See 2A C. Sands, Sutherland on Statutory Construction Sec. 49.09 at 401 (4th ed. 1984) ("The presumption of acquiescence and adoption can be rebutted by other legislative history.").
 
 
 101
 Were we to infer congressional approval of Interior's rules because it did not amend the statute to explicitly repudiate them, we would in effect be insisting that a Congress legislatively reiterate an already clear statutory command in order to fend off an impermissible interpretation. As we all know, many statutes are on the books for which no congressional majority could presently be garnered either to reenact or to repeal, yet those acts continue as valid law; indeed, a canon of equal worth with the acquiescence-by-reenactment rule is the one disfavoring repeal by implication. We conclude that the acquiescence-by-reenactment rule is not applicable to a situation where the regulations violate the original statutory language and where Congress' decision not to amend the relevant statutory provisions evidently stems from a belief that the provisions have been clear all along.
 
 D. Conclusion
 
 102
 Our reading of the complex of relevant provisions concerning damages under CERCLA convinces us that Congress established a distinct preference for restoration cost as the measure of recovery in natural resource damage cases. This is not to say that DOI may not establish some class of cases where other considerations--i.e., infeasibility of restoration or grossly disproportionate cost to use value--warrant a different standard. We hold the "lesser of" rule based on comparing costs alone, however, to be an invalid determinant of whether or not to deviate from Congress' preference.
 
 IV. THE PUBLIC OWNERSHIP RULE
 
 103
 The second issue raised by State and Environmental Petitioners is whether the regulations invalidly limit the availability of natural resource damages to cases where the resources harmed (such as land, water, air, fish and wildlife) are owned by federal, state, local or foreign governments, rather than by private parties. The critical language in the DOI regulations mirrors the language of the statute, but State and Environmental Petitioners complain that DOI's comments accompanying the publication of the regulations articulate an understanding of the regulation that is inconsistent with the statute. The issue is further complicated by the statements of DOI counsel at oral argument, which put yet another interpretive gloss on the regulation.
 
 A. The Statute
 1. Statutory Language
 
 104
 The critical language is contained in CERCLA's definition of the term "natural resources." The statute provides that responsible parties shall be liable for "damages for injury to, destruction of, or loss of natural resources." Sec. 107(a)(C), 42 U.S.C. Sec. 9607(a)(C). In the "definitions" sections, the statute provides that "natural resources" are resources "belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States[,] ... any State or local government, any foreign government, any Indian tribe, or, if such resources are subject to a trust restriction on alienation, any member of an Indian tribe." Sec. 101(16), 42 U.S.C. Sec. 9601(16). The difficult questions, obviously, center around the series of phrases: "belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by" a state or federal or foreign government.
 
 
 105
 Initially we deal with one argument presented by State and Environmental Petitioners that is without merit. They point to a section of CERCLA providing that liability for harm to natural resources "shall be to the United States Government and to any State for natural resources within the State or belong to, managed by, controlled by, or appertaining to such State" and to Indian tribes and their members in some circumstances. Sec. 107(f)(1), 42 U.S.C. Sec. 9607(f)(1) (emphasis added). State and Environmental Petitioners argue on the basis of this section that CERCLA covers injuries to any land, water, air, fish and wildlife that exist "within [a] State"--a reading which, if true, would establish natural resource damage liability for harm to all private as well as public property. This interpretation, however, rips the "within the State" phrase out of its statutory context. "[N]atural resources within the State" incorporates Sec. 101(16)'s definition of "natural resources" as resources "belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by" the state. Thus it is this series of phrases, and not the "within the State" language, that controls the issue.[43]
 
 
 106
 Further textual evidence is provided by CERCLA's references to resources held by Indian tribes and their members. CERCLA (as amended by SARA) includes in its definition of "natural resources" those resources "belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by ... any Indian tribe, or, if such resources are subject to a trust restriction on alienation, any member of an Indian tribe." Sec. 101(16), 42 U.S.C. Sec. 9601(16) (emphasis added). This addition of the Indian clauses in 1986 expanded but combined the definition of "natural resources" to include some resources under purely private ownership. No such provision would have been necessary if Congress either in 1980 or in 1986 had intended "natural resources" to generally include resources under purely private ownership.
 
 
 107
 It should be noted, however, that while the statute excludes purely private resources, it clearly does not limit the definition of "natural resources" to resources owned by a government. If that were the meaning of Sec. 101(16), then all the phrases other than "belonging to" would be surplusage. If the words "managed by, held in trust by, appertaining to, or otherwise controlled by" mean anything at all, they must refer to certain types of governmental (federal, state or local) interests in privately-owned property.[44]
 
 2. Legislative History
 
 108
 The legislative history of CERCLA further illustrates that damage to private property--absent any government involvement, management or control--is not covered by the natural resource damage provisions of the statute. Early drafts of CERCLA would have covered private property. See H.R. 7020, 96th Cong., 2d Sess. Sec. 5 (1980), reprinted in 2 Legislative History, supra note 19, at 40 (damages to include "all damages for personal injury, injury to real or personal property, and economic loss, resulting from such release or threatened release"); H.R. 85, 96th Cong., 1st Sess. Sec. 103(a)(2), reprinted in 2 Legislative History at 487 (damages to include "injury to, or destruction of, real or personal property"); S. 1480, 96th Cong., 1st Sess. Sec. 4(a)(2)(A), reprinted in 1 Legislative History at 169 (damages to include "any injury to, destruction of, or loss of any real or personal property"). Each of these proposed provisions was rejected and the statute's "natural resources" formulation was adopted instead. Congress quite deliberately excluded purely private property from the ambit of the natural resource damage provisions.
 
 
 109
 B. The Regulations and Accompanying Commentary
 
 
 110
 The critical language of the DOI regulation, 43 C.F.R. Sec. 11.14(z), precisely mirrors the CERCLA definition of "natural resources." State and Environmental Petitioners challenge, however, the DOI comments accompanying publication of the regulations. These comments--they say--suggest a too-narrow reading of the statutory/regulatory language to prohibit recovery for injury to publicly managed private property.
 
 
 111
 The preamble to the final rule contained the following two statements:
 
 
 112
 The Department believes that Congress has defined "natural resources" with sufficient specificity to leave no doubt that resources owned by parties other than Federal, State, local or foreign governments (i.e., privately-owned resources) are not included....
 
 
 113
 * * *
 
 
 114
 The Department notes, as stated above, that section 101(16) of CERCLA clearly indicates that damage to privately-owned natural resources are not to be included in natural resource damage assessments.
 
 
 115
 51 Fed.Reg. at 27,696.
 
 
 116
 Taken at face value, these comments appear to exclude any privately owned property from the ambit of the natural resource damage provisions, no matter how heavily involved a governmental entity may be in managing or otherwise controlling the property. This reading of the statute would ignore everything that comes after the words "belonging to." If DOI's position is truly that the statute and the regulation limit recovery for damages to resources where title is held by a governmental entity, it would pose a serious risk of running afoul of CERCLA.
 
 
 117
 Counsel for DOI has given us strong reason to believe, however, that the statements in the preamble should not be read so literally. At oral argument, counsel stated that the reach of the CERCLA natural resource damage provisions does not hinge solely on ownership--or, for that matter, on the exercise of a formal document transferring the property to a government entity to be held in trust. Rather, a substantial degree of government regulation, management or other form of control over the property would be sufficient to make the CERCLA natural resource damage provisions applicable. (For example, a state law requiring owners of tideland property to permit public access could well bring the land within the ambit of CERCLA's natural resource damage provisions. See, e.g., Phillips Petroleum Co. v. Mississippi, 484 U.S. 469, 108 S.Ct. 791, 799 n. 12, 98 L.Ed.2d 877 (1988) ("even in some of these States--i.e., even where tidelands are privately held--public rights to use the tidelands for the purposes of fishing, hunting, bathing, etc., have long been recognized").) Whether this assertion by DOI counsel or the statements contained in the preamble state the official position of DOI is not altogether clear. Since the DOI regulations themselves track the statutory language precisely, we remand the record to the agency for a clarification of its interpretation of its own regulations insofar as they may extend to lands not owned by the government.
 
 V. THE "COMMITTED USE" REQUIREMENTNT
 
 118
 The regulations provide that "[b]efore estimating damages based on the diminution of use values under Sec. 11.83 of this part, the uses made of the resource services identified in the Quantification phase should be determined." 43 C.F.R. Sec. 11.84(b)(1). In ascertaining the "uses made of a resource," a trustee may consider only "committed uses":
 
 
 119
 Only committed uses, as that phrase is used in this part, of the resources or services over the recovery period will be used to measure the change from the baseline resulting from injury to a resource. The baseline uses must be reasonably probable, not just in the realm of possibility. Purely speculative uses of the injured resource are precluded from consideration in the estimation of damages.
 
 
 120
 43 C.F.R. Sec. 11.84(b)(2). A "committed use" is defined as
 
 
 121
 either: a current public use; or a planned public use of a natural resource for which there is a documented legal, administrative, budgetary, or financial commitment established before the discharge of oil or release of a hazardous substance is detected.
 
 
 122
 43 C.F.R. Sec. 11.14(h).
 
 
 123
 Environmental petitioners object that the "committed use" requirement is inconsistent with congressional intent because for many natural resources, it will be difficult for trustees to document currently committed uses. Few existing uses, especially in remote areas, have been surveyed and recorded, and "legal, administrative, budgetary, or financial commitment[s]" may be poorly documented before a discharge occurs.
 
 
 124
 We uphold the "committed use" criterion because we interpret it as applying only to the calculation of use values. Because we also invalidate the current version of the "lesser of" rule, the "committed use" requirement is relevant, as the regulations now stand, only to the calculation of diminution in use values during the period required to achieve restoration or replacement, see 43 C.F.R. Sec. 11.84(g), with one exception not important here, see 43 C.F.R. Sec. 11.62(b)(ii), (iii) (establishing that standards of the Safe Drinking Water Act, 42 U.S.C. Secs. 300f-300j-9, or the Clean Water Act, 33 U.S.C. Secs. 1251-1376, can be used to define "injury" to a surface water resource only if the resource is "committed" to a use protected by those statutes). Viewed in this light, the "committed use" standard is an eminently reasonable construction of the statute, because it avoids the need for unreliable, and likely self-serving, speculation regarding future possible uses. Congress directed DOI to select the "best available" methodologies for determining damages, 42 U.S.C. Sec. 9651(c)(2), and a procedure that permitted unduly speculative assessments would not fulfill this intent. Given that the "committed use" concept does not restrict trustees' ability to recover damages except for use values lost during the interim period before restoration is complete, we find that DOI's approach does not unduly restrict recovery of damages for natural resource injuries.
 
 
 125
 Our decision to uphold the "committed use" requirement is premised on our interpretation of the regulation to mean that a trustee is not prohibited from recovering the costs of restoring or replacing a natural resource, even when that resource has no documented "committed use." This was confirmed by counsel for DOI at oral argument. Although the preamble to the rules contains some stray language to the contrary, see 51 Fed.Reg. 27,713, 27,772 (1986), we believe the construction we rely on today is the best interpretation of the regulations. The "committed use" language appears in a section aimed at determining "uses made of a resource" for purposes of "estimating damages based on the diminution of use values," 43 C.F.R. Sec. 11.84(b)(1). The "committed use" standard immediately follows, in subsection 11.84(b)(2). By their terms and structure the regulations thus provide that proof of a "committed use" is not a prerequisite to recovery of restoration costs. Moreover, imposing such a requirement on calculations of restoration cost would be irrational because a resource can be restored to its ex ante condition, or a replacement resource acquired, without the need to determine the precise uses to which that resource had previously been put. DOI's concern about speculative estimates of value is entirely absent when restoration cost, rather than use value, is the focus of damage assessment.
 
 
 126
 We uphold the "committed use" requirement on this basis.
 
 VI. THE HIERARCHY OF ASSESSMENT METHODS
 
 127
 The regulations establish a rigid hierarchy of permissible methods for determining "use values," limiting recovery to the price commanded by the resource on the open market, unless the trustee finds that "the market for the resource is not reasonably competitive." 43 C.F.R. Sec. 11.83(c)(1). If the trustee makes such a finding, it may "appraise" the market value in accordance with the relevant sections of the "Uniform Appraisal Standards for Federal Land Acquisition," see 43 C.F.R. Sec. 11.83(c)(2). Only when neither the market value nor the appraisal method is "appropriate" can other methods of determining use value be employed, see 43 C.F.R. Sec. 11.83(d).
 
 
 128
 Environmental petitioners maintain that Interior's emphasis on market value is an unreasonable interpretation of the statute, under the so-called "second prong" of Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 845, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984), and we agree. While it is not irrational to look to market price as one factor in determining the use value of a resource, it is unreasonable to view market price as the exclusive factor, or even the predominant one. From the bald eagle to the blue whale and snail darter, natural resources have values that are not fully captured by the market system. See Commonwealth of Puerto Rico v. SS Zoe Colocotroni, 628 F.2d 652, 673-74 (1st Cir.1980), cert. denied, 450 U.S. 912, 101 S.Ct. 1350, 67 L.Ed.2d 336 (1981). DOI's own CERCLA 301 Project Team recognized that "most government resources, particularly resources for which natural resource damages would be sought[,] may often have no market." DOI has failed to explain its departure from this view. Indeed, many of the materials in the record on which DOI relied in developing its rules regarding contingent valuation expressed the same idea; it is the incompleteness of market processes that gives rise to the need for contingent valuation techniques. Courts have long stressed that market prices are not to be used as surrogates for value "when the market value has been too difficult to find, or when its application would result in manifest injustice to owner or public," United States v. Commodities Trading Corp., 339 U.S. 121, 123, 70 S.Ct. 547, 549, 94 L.Ed. 707 (1950); see also United States v. Cors, 337 U.S. 325, 332, 69 S.Ct. 1086, 1090, 93 L.Ed. 1392 (1949) (warning against making "a fetish" of market value, "since that may not be the best measure of value in some cases"). As we have previously noted in the context of the "lesser of" rule, see supra note 40, market prices are not acceptable as primary measures of the use values of natural resources. See generally Anderson, Natural Resources Damages, Superfund, and the Courts, 16 Envtl.Aff. 405, 442-46 (1989). We find that DOI erred by establishing "a strong presumption in favor of market price and appraisal methodologies." 51 Fed.Reg. 27,720 (1986).
 
 
 129
 We are not satisfied that the problem is solved by the provision in section 11.83(c)(1) permitting nonmarket methodologies to be used when the market for the resource is not "reasonably competitive." There are many resources whose components may be traded in "reasonably competitive" markets, but whose total use values are not fully reflected in the prices they command in those markets. Interior itself provides ample proof of the inadequacy of the "reasonably competitive market" caveat. For example, DOI has noted that "the hierarchy established in the type B regulation" would dictate a use value for fur seals of $15 per seal, corresponding to the market price for the seal's pelt, see 52 Fed.Reg. 9,092 (1987). Another example of DOI's erroneous equation of market price with use value is its insistence that the sum of the fees charged by the government for the use of a resource, say, for admission to a national park, constitutes "the value to the public of recreational or other public uses of the resource," 43 C.F.R. Sec. 11.83(b)(1), because "these fees are what the government has determined to represent the value of the natural resource and represent an offer by a willing seller," 51 Fed.Reg. 27,719 (1986). This is quite obviously and totally fallacious; there is no necessary connection between the total value to the public of a park and the fees charged as admission, which typically are set not to maximize profits but rather to encourage the public to visit the park, see 16 U.S.C. Secs. 460k-3, 460l-6a. In fact, the decision to set entrance fees far below what the traffic would bear is evidence of Congress's strong conviction that parks are priceless national treasures and that access to them ought to be as wide as possible, and not, as DOI would have it, a sign that parks are really not so valuable after all.
 
 
 130
 Neither the statute nor its legislative history evinces any congressional intent to limit use values to market prices. On the contrary, Congress intended the damage assessment regulations to capture fully all aspects of loss. CERCLA section 301(c)(2) commands Interior to "identify the best available procedures to determine [natural resource] damages, including both direct and indirect injury, destruction or loss." 42 U.S.C. Sec. 9651(c)(2). The Senate CERCLA report stated that assessment procedures should provide trustees "a choice of acceptable damage assessment methodologies to be employed [and should] select the most accurate and credible damage assessment methodologies available." S.Rep. No. 848, 96th Cong., 2d Sess. 85-86 (1980). The current rules defeat this intent by arbitrarily limiting use values to market prices.
 
 
 131
 On remand, DOI should consider a rule that would permit trustees to derive use values for natural resources by summing up all reliably calculated use values, however measured, so long as the trustee does not double count. Market valuation can of course serve as one factor to be considered, but by itself it will necessarily be incomplete. In this vein, we instruct DOI that its decision to limit the role of non-consumptive values, such as option and existence values, in the calculation of use values rests on an erroneous construction of the statute. The regulations provide that "[e]stimation of option and existence values shall be used only if the authorized official determines that no use values can be determined," 43 C.F.R. Sec. 11.83(b)(2); see also id. at Sec. 11.83(d)(5)(ii). This limitation apparently reflects Interior's crabbed interpretation of CERCLA explained in the preamble to the regulations:
 
 
 132
 The Department notes that Sec. 11.83(b) has been changed to explicitly state that option and existence values may be estimated in lieu of use values only when use values cannot be determined. Ordinarily, option and existence values would be added to use values. However, section 301(c) of CERCLA mentions only use values. Therefore, the primary emphasis in this section is on the estimation of use values.
 
 
 133
 51 Fed.Reg. 27,719 (1986).
 
 
 134
 DOI has erroneously construed the statute. First, section 301(c)(2) requires Interior to "take into consideration factors including, but not limited to * * * use value." 42 U.S.C. Sec. 9651(c)(2) (emphasis added). The statute's command is expressly not limited to use value; if anything, the language implies that DOI is to include in its regulations other factors in addition to use value. Second, even under its reading of section 301(c), DOI has failed to explain why option and existence values should be excluded from the category of recognized use values. Indeed, the CERCLA 301 Project Team draft referred to option and existence values as "non-consumptive use values" (emphasis added). Option and existence values may represent "passive" use, but they nonetheless reflect utility derived by humans from a resource, and thus, prima facie, ought to be included in a damage assessment. See Cross, Natural Resource Damage Valuation, 42 Vand.L.Rev. 269, 285-89 (1989) (noting that surveys reveal that the option and existence value of national parks may be quite large). DOI is entitled to rank methodologies according to its view of their reliability, but it cannot base its complete exclusion of option and existence values on an incorrect reading of the statute.
 
 
 135
 We hold that the hierarchy of use values is not a reasonable interpretation of the statute.
 
 VII. THE TEN PERCENT DISCOUNT RATE
 
 136
 State and Environmental Petitioners next challenge Interior's decision to use a discount rate to calculate the present value of an expected future injury. Petitioners challenge both the decision to discount a future injury for present value and Interior's choice of a ten percent rate. See 43 C.F.R. Sec. 11.84(e). As petitioners point to no CERCLA provision addressing the precise question in issue, their burden is to show that the imposition of the discount rate was unreasonable or contrary to the statutory purpose.
 
 
 137
 Petitioners' central argument appears to be that discounting for present value will by its nature "severely undervalue[ ]" long-term injury to natural resources. But this argument is misplaced: the point of the CERCLA natural resource damage provisions is to make polluters pay the costs of restoring or replacing damaged resources or acquiring their equivalent. If a release of hazardous substances will necessitate a restoration project costing x dollars five years from now, CERCLA requires that the responsible party pay a sum sufficient to cover those costs at that time. Due to the inherent time-value of money (coupled with the effects of inflation), an amount significantly less than x dollars invested today will yield CERCLA's required x dollars at the time the restoration costs are incurred five years from now. Using the proper interest rate as a discount rate, it is possible to calculate how much money must be collected today to equal x dollars in the future. The danger of undervaluation arises from an underestimate of the future cost of restoration or from an incorrect discount rate, not from the basic process of discounting itself.
 
 
 138
 State and Environmental Petitioners' two additional concerns are therefore closer to the target. First, they argue that there is uncertainty as to the correct discount rate. Second, they argue that natural resources will tend to become scarcer over time and hence more valuable; consequently, there is too much uncertainty as to the future cost of restoring or replacing damaged resources to permit an accurate discount rate.
 
 
 139
 As to the first point, a discount rate by its nature involves a predictive judgment about future rates of interest.[45] Apart from the truism that the proper discount rate is always a matter of uncertainty, petitioners have given us no reason to substitute our judgment for that of Interior and of the Office of Management and Budget, whose circular provided the ten percent figure chosen. 43 C.F.R. Sec. 11.84(e)(2). While DOI's explanation of its decision to adopt the Office of Management and Budget figure certainly was terse, we decline to step in and undermine what is first and foremost a policy choice.[46]
 
 
 140
 As to the second point, we agree that Interior should take into account the possibility that the value of a particular resource or the cost of a particular restoration project will increase over time, as a function of scarcity, faster than the rise in the general price level. If such an increase can be reasonably foreseen, it should be reflected in the estimate of the future cost of a restoration project; if the estimated future cost is reasonably accurate, then the application of a discount rate to arrive at a present value cannot itself be objectionable. Interior's regulations provide that uncertainties as to the cost of future restoration are to be considered in the assessment process and factored into the analysis.[47] So long as the trustee performing the assessment takes into account--as the regulations provide it should--the possibility that restoration costs might rise faster than the general price level, State and Environmental Petitioners' arguments against the use of a discount rate are without merit.
 
 
 141
 VIII. THE ALLEGEDLY PREFERENTIAL TREATMENT OF PRPS
 
 
 142
 State and Environmental Petitioners allege that Interior's regulations give potentially responsible parties (PRPs)--i.e., those parties who may be held responsible for the release of hazardous substances and be required to pay natural resource damages--"inappropriate, preferential treatment compared to that given States and the public." Pet. Br. 66. Petitioners challenge the rules' provision allowing PRPs to be assigned the task of conducting a natural resource damage assessment. They also challenge the rules' establishment of periods in which only a PRP, and not members of the public, will be notified of developments in the assessment process and be given the opportunity to comment. We consider the two challenges in turn, keeping in mind Chevron 's command that, unless Congress addressed the precise question in issue, Interior's interpretation of CERCLA must be upheld if it is reason able and consistent with the statutory purpose.
 
 
 143
 A. Delegation of the Assessment Process to PRPs
 
 
 144
 1. Delegability of Assessment Tasks Generally
 
 
 145
 The regulation authorizing assessments by PRPs provides as follows:
 
 
 146
 At the option of the authorized official and if agreed to by any potentially responsible party or parties acting jointly, the potentially responsible party or any other party under the direction, guidance, and monitoring of the authorized official may implement all or any part of the Assessment Plan finally authorized by the authorized official.
 
 
 147
 43 C.F.R. 11.32(d).
 
 
 148
 State and Environmental Petitioners aim a fusillade of challenges against the practice of letting a PRP conduct an assessment; they compare it to appointing the defendant in a tort suit as a special master to decide on the proper amount of damages. Petitioners base their legal argument on statutory language providing that designated state and federal officials "shall assess damages" and that only assessments "made by a Federal or State trustee" are accorded a rebuttable presumption of correctness. Sec. 107(f)(2)(A)-(B); Sec. 107(f)(2)(C).
 
 
 149
 The Sec. 107 argument is unpersuasive. The "shall assess damages" language does not indicate that a government trustee has no power to delegate the task of conducting the assessment, even when the trustee retains final authority over the assessment methods and oversees the work. Indeed, reading the "shall assess damages" language as narrowly as petitioners do would compel the implausible conclusion that Congress intended to prevent government trustees from hiring subcontractors to undertake the technically demanding tasks associated with an assessment.
 
 
 150
 As it turns out, the legislative history shows that Congress did consider the precise question at issue. Section 107(f)(2) was added to the statute by SARA in 1986. Its purpose was described in a House report as follows:
 
 
 151
 The amendment makes clear that the responsibility to assess damages for injury to natural resources lies with the federal agency designated as the natural resource trustee for those resources.... Of course, by specifying that the federal natural resource trustees shall assess damages, the Committee does not intend to foreclose their flexibility to reach agreements with potentially responsible parties whereby the parties themselves undertake the assessments.
 
 
 152
 H.R.Rep. No. 253(IV), supra note 8, at 49 (emphasis added). Thus, the House Committee on Merchant Marine and Fisheries plainly envisioned that a government trustee could delegate to a PRP the job of "undertak[ing]" an assessment. As for the argument that the delegation of assessment tasks to PRPs is "contrary to fundamental principles of fairness and jurisprudence" due to potential conflicts of interest, Pet. Br. 71, the committee apparently considered that danger to be outweighed by the desirability of granting trustees the "flexibility" to delegate assessment tasks when the trustees deem it appropriate to do so. At least one senator disagreed, taking to the Senate floor to denounce Interior's policy of permitting PRPs to conduct damage assessments. See 132 Cong.Rec. S14930 (daily ed. Oct. 3, 1986) (statement of Sen. Baucus). Even if we viewed Senator Baucus' statement as an indication that the evidence of congressional intent on this particular issue is somewhat ambiguous, we would nonetheless uphold Interior's rule as reasonable and not inconsistent with the statutory purpose. A PRP conducts an assessment only if an authorized government official calls on it to do so. 43 C.F.R. Sec. 11.32(d). The assessment must follow the methods outlined in the assessment plan, which must have been drawn up as a coordinated effort among all affected government trustees, state and federal. Id. Sec. 11.32(a)(1). The delegation rule is not unreasonable.
 
 2. Specific Aspects of the Delegation Rule
 
 153
 State and Environmental Petitioners argue that, even if some delegation is permissible,, Interior's rule goes too far. First they point out that, where the harmed natural resources are located on federal property, the appropriate federal agency shall serve as "lead authorized official." 43 C.F.R. Sec. 11.32(a)(1)(ii)(B). That agency will act as final arbiter of disputes among trustees whenever trustees representing different governments or agencies fail to reach a consensus. 43 C.F.R. Sec. 11.32(a)(1)(ii)(A). Thus, the federal agency has the power to delegate assessment tasks to a PRP over the objections of state trustees. We find nothing in such an arrangement unreasonable or contrary to statutory purpose. It is entirely reasonable to appoint a tiebreaker to resolve disagreements among government entities, and the federal agency whose land is most directly affected seems the logical choice.
 
 
 154
 State and Environmental Petitioners raise yet another point, arguing that the regulations empower trustees to delegate the PRPs not only "ministerial" tasks but also "the authority to make discretionary decisions" about the extent of liability resulting from their own conduct. Pet. Br. 71; see also Reply Br. 32. This fear is largely imaginary. The regulation leaves the decision of which assessment tasks to delegate in the hands of the lead authorized official. Whatever that official decides to delegate, the PRP's assessment work must take place "under the direction, guidance, and monitoring of the authorized official." 43 C.F.R. Sec. 11.32(d). The PRP does not have free rein to conduct any kind of assessment it wishes; rather, it must "implement ... the Assessment Plan finally approved by the authorized official." Id. As DOI indicated in its preamble to the rules, "all actions taken by potentially responsible parties to implement an Assessment Plan occur under the ultimate approval and authority of the authorized official acting as trustee." 51 Fed.Reg. at 27,704. The PRP "functions in a strictly ministerial role. The final choice of methodologies rests solely with the authorized official." Id. Although petitioners complain that the regulation fails to identify which decisions are ministerial and which are discretionary, we do not perceive that to be a fatal deficiency. The trustee has absolute authority to direct and control the PRP in the assessment function: that should be enough to permit flexibility while still retaining ultimate accountability with a public trustee.
 
 B. Public Notice and Comment
 
 155
 State and Environmental Petitioners challenge another aspect of the DOI rules that allegedly accords preferential treatment to PRPs. At certain stages in the preassessment and assessment plan phases, PRPs receive notice of what the government trustees are doing along with the opportunity to comment on it, while members of the public are denied the same rights of notice and comment at that time. And, although the state trustee of an affected resource enjoys full participation in all stages of the process, other state agencies stand in the same position as the public: they too are denied the notice and comment rights accorded PRPs. Petitioners fail to persuade us, however, that the notice and comment provisions are unreasonable or contrary to the statutory purpose.
 
 
 156
 Under the regulations, a government trustee first undertakes a "preassessment screen" and then decides whether a full-fledged natural resource assessment is to be performed. At that point, the trustee notifies the PRPs of its intent to perform an assessment, but the regulations do not require that the public or other state agencies be notified. See 43 C.F.R. Sec. 11.32(a)(2)(iii)(A)-(B). Later, after an assessment plan has been drafted, it must be made available to the public; comments on the assessment plan are eventually included in the final report on the assessment. 43 C.F.R. Sec. 11.32(c)(1)-(2). Likewise, any significant modifications to the assessment plan are subject to similar notice and comment regulations. 43 C.F.R. Sec. 11.32(e).
 
 
 157
 In an effort to show that such limited participation of the public is contrary to the purpose of the statute, petitioners point to a CERCLA provision stating that a trustee can develop a plan for the expenditure of recovered damages only "after adequate public notice and opportunity for hearing and consideration of all public comment." Sec. 111(i), 42 U.S.C. Sec. 9611(i). They also point to provisions requiring public comment on remedial actions and Superfund settlements. Secs. 117, 122(d)(2), 122(i), 42 U.S.C. Secs. 9617, 9622(d)(2), 9622(i). Yet, far from proving their point, the fact that Congress expressly provided for notice and comment in these other contexts suggests that its failure to do so at the preassessment stage was a considered decision. As to the rules' reasonableness, DOI explains that PRPs merit more involvement in the pre-assessment process than does the general public because PRPs have a stake in the cost-effectiveness of the assessment methods chosen. DOI also contends that involvement of PRPs early in the process will tend to promote settlement of natural resource damage claims. Given that the public is notified and its comments are heard once an assessment plan is drafted, we cannot say that Interior's regulations are unreasonable.[48]
 
 
 158
 IX. LIMITATION ON RECOVERY OF ASSESSMENT COSTS
 
 
 159
 CERCLA imposes liability on responsible parties for, inter alia, the "reasonable costs of assessing" natural resource damages. Sec. 107(a)(C), 42 U.S.C. Sec. 9607(a)(C). The statute does not define the term "reasonable costs." State and Environmental Petitioners challenge a provision in the DOI regulations limiting the definition of "reasonable costs" to situations where "the anticipated cost of the assessment is expected to be less than the anticipated damage amount." 43 C.F.R. Sec. 11.14(ee). Petitioners characterize the rule as "inflexible" and "irrational."
 
 
 160
 There is no indication that Congress had in mind a particular definition of "reasonable costs." The legislative history of CERCLA indicates, however, that Congress intended natural resource damage assessments to be "accomplished in the most cost-effective manner possible," that they be "efficient as to both time and cost," and that they be the "most accurate and efficient for accomplishing the mandates of this legislation." S.Rep. No. 848, supra, at 85-86. The idea behind Interior's regulation is that it is wasteful to devote more resources to a damage assessment than can be recovered by the trustee for the loss of the resource itself. This principle is a rational one and is consonant with the statutory purpose. Nor is the rule inflexible: a trustee that launches an inexpensive assessment of what is initially thought to be a minor amount of environmental harm is free to expand the assessment if it uncovers evidence showing that the "anticipated damage amount" will be larger than previously believed.[49] We therefore decline to overturn the rule.
 
 X. THE ACCEPTANCE CRITERIA
 
 161
 State and Environmental Petitioners challenge Interior's regulation establishing a set of "acceptance criteria" as a framework for determining whether a hazardous substance release actually caused injury to the particular biological resource (such as a flock of birds or a school of fish) for which a government trustee is seeking damages.
 
 
 162
 In order to establish causation under the acceptance criteria, the trustee must show that (i) the "biological response" alleged to have been precipitated by the hazardous substance release is a "commonly documented" response to oil or hazardous substance spills, (ii) oil or hazardous substances are "known to cause" such a response in field studies, (iii) oil or hazardous substances are "known to cause" such a response in controlled experiments, and (iv) the biological response can be measured by a technique that is practical to perform and has been "adequately documented in scientific literature." 43 C.F.R. Sec. 11.62(f)(2). Additionally, the trustee must show that the biological response identified in accordance with these acceptance criteria actually differs from the condition of similar organisms in a "control area"--i.e., an unpolluted area that is otherwise similar to the polluted area. 43 C.F.R. Sec. 11.62(f)(3).
 
 
 163
 Petitioners launch a general attack at all of these requirements as being "extraordinarily burdensome" and as requiring "virtually absolute scientific proof" of causation. Pet. Br. 82. They allege, in conclusory terms, that the acceptance criteria require a greater quantum of evidence of causation than the common law requires; this, they say, is both unreasonable and contrary to CERCLA's purpose of liberalizing the traditional causation-of-injury standard. Pet. Br. at 85; Reply Br. 36. Petitioners also complain that, unless a trustee can find already-published scientific studies--field studies as well as controlled experiments--documenting the particular biological response complained of, the trustee must undertake such studies at its own expense, unreimbursed by the parties responsible for the spill. This, petitioners say, is contrary to the command of Sec. 107(a)(C), which provides that responsible parties are liable for the reasonable costs of assessing damages. Pet. Br. 83.
 
 A. The Regulations
 
 164
 Interior's regulations define an actionable "injury" as "a measurable adverse change, either long- or short-term, in the chemical or physical quality or the viability of a natural resource," resulting directly or indirectly from an oil spill or hazardous substance release. 43 C.F.R. Sec. 11.14(v). For biological resources, an injury is deemed to have resulted from such a release if the concentration of the substance is sufficient to cause the resource or its offspring to suffer death, disease, behavioral abnormalities, cancer, genetic mutations, physiological malfunctions, or physical deformations. Id. Sec. 11.62(f)(1).[50] To determine whether a sufficient showing of causation has been made, the regulations establish the following acceptance criteria, all four of which must be met.
 
 
 165
 (i) The biological response is often the result of exposure to oil or hazardous substances. This criterion excludes biological responses that are caused predominately by other environmental factors such as disturbance, nutrition, trauma, or weather. The biological response must be a commonly documented response resulting from exposure to oil or hazardous substances.
 
 
 166
 (ii) Exposure to oil or hazardous substances is known to cause this biological response in free-ranging organisms. This criterion identifies biological responses that have been documented to occur in a natural ecosystem as a result of exposure to oil or hazardous substances. The documentation must include the correlation of the degree of the biological response to the observed exposure concentration of oil or hazardous substances.
 
 
 167
 (iii) Exposure to oil or hazardous substances is known to cause this biological response in controlled experiments. This criterion provides a quantitative confirmation of a biological response occurring under environmentally realistic exposure levels that may be linked to oil or hazardous substances exposure that has been observed in a natural ecosystem. Biological responses that have been documented only in controlled experimental conditions are insufficient to establish correlation with exposure occurring in a natural ecosystem.
 
 
 168
 (iv) The biological response measurement is practical to perform and produces scientifically valid results. The biological response measurement must be sufficiently routine such that it is practical to perform the biological response measurement and to obtain scientifically valid results. To meet this criterion, the biological response measurement must be adequately documented in scientific literature, must produce reproducible and verifiable results, and must have well defined and accepted statistical criteria for interpreting as well as rejecting results.
 
 
 169
 43 C.F.R. Sec. 11.62(f)(2). In addition to meeting the acceptance criteria, the trustee must show a "statistically significant difference in the biological response between samples from populations in the assessment area and in the control area." 43 C.F.R. Sec. 11.62(f)(3).
 
 B. Analysis
 
 170
 Petitioners argue that the acceptance criteria are contrary to the statutory command that the standard of proof of causation-of-injury under CERCLA be less strict than that required by the common law. We conclude that CERCLA is ambiguous on this point, and that Interior's reading of the Act--as retaining traditional causation analysis for determining whether a hazardous substance release caused a particular injury--is therefore permissible under Chevron Step Two. We also reject petitioners' argument that the acceptance criteria are unreasonable within the meaning of Chevron. As to the non-compensability of the costs of general scientific studies under Sec. 107(a)(C), we conclude that the statute is ambiguous and that Interior's construction of it is a permissible one.
 
 
 171
 1. CERCLA and the Common-Law Causation Standard
 
 
 172
 The statutory text of CERCLA provides no clues as to whether proof of causation-of-injury should be less strict than that required by the common law. Section 107(a)(C) provides that responsible parties are liable for damages for injury to natural resources "resulting from" a release of hazardous substances or oil. 42 U.S.C. Sec. 9607(a)(C). Section 301(c)(2) offers no further guidance: the regulations under it must specify protocols for determining the type and extent of "both direct and indirect injury, destruction, or loss." 42 U.S.C. Sec. 9651(c)(2).
 
 
 173
 The legislative history is ambiguous, as well. The causation-of-injury issue must, of course, be viewed against the backdrop of Congress' general concern for liberalizing the standards of the common law. See, e.g., S.Rep. No. 848, supra note 10, at 13-14 ("[T]raditional tort law presents substantial barriers to recovery.... [C]ompensation ultimately provided to injured parties is generally inadequate."); see also supra note 38. There is little evidence, however, that Congress specifically intended to ease the standard of proof for showing that a particular spill caused a particular biological injury. The Congressional Research Service report cited by petitioners does discuss causation-of-injury standards as one of the then-existing obstacles to recovery under the common law, but it is largely descriptive, not critical. The report states:
 
 
 174
 [P]laintiffs in toxic pollution suits may have substantial difficulty in proving that a particular exposure to a pollutant was the cause in fact of an injury. The case studies reinforce the notion that such problems of proof can be significant barriers to recovery.
 
 
 175
 See Senate Comm. on Environment and Public Works, 96th Cong., 2d Sess., Six Case Studies of Compensation for Toxic Substances Pollution: Alabama, California, Michigan, Missouri, New Jersey, and Texas; A Report Prepared Under the Supervision of the Congressional Research Service of the Library of Congress 517 (Comm. Print 1980), J.A. 2893. A citation to it in the Senate CERCLA report[51] certainly does not rise to the level of an unambiguous signal that Congress wanted DOI to liberalize the common-law causation standard.
 
 
 176
 Additional evidence supports the proposition that CERCLA never declared itself on this matter. While debating the passage of CERCLA in 1980, Congress considered two provisions (one ultimately rejected and the other ultimately enacted) both of which clearly called for liberalization of the traditional common-law causation standards in contexts other than the one at issue in this case.
 
 
 177
 First, Congress considered and rejected a nontraditional causation standard in relation to a never-enacted provision establishing liability for the medical expenses of persons injured by hazardous substance spills. An early bill contained the following provision:
 
 
 178
 (c) Notwithstanding the ordinary requirements for proof of cause in fact or proximate cause of damage, injury, or loss, a person liable under this section for any discharge, release, or disposal of any hazardous substance shall be liable for all medical expenses under [never-enacted] subsection (a)(2)(F) of this section if a reasonable person could conclude that such medical expenses and the injury or disease which caused them are reasonably related to such discharge, release or disposal....
 
 
 179
 S. 1480, 96th Cong., 1st Sess. Sec. 4(c), reprinted in 1 Legislative History, supra note 19, at 171 (emphasis added). This suggests that, when it wanted to, Congress knew how to reject "the ordinary requirements" for proof of causation.
 
 
 180
 CERCLA as enacted contains another clear--if somewhat less explicit--rejection of traditional causation standards. Section 107's imposition of liability on the four enumerated classes of responsible parties[52] does not require in all cases that the defendant have in fact caused the release. State of New York v. Shore Realty Corp., 759 F.2d 1032, 1044-45 (2d Cir.1985). The Shore Realty court noted that the language of Sec. 107(a)--which imposes liability on responsible parties connected with a vessel or facility "from which there is a release"--does not itself lay down a causation requirement. 759 F.2d at 1043 n. 16, 1044 & n. 18. The court went on to point out that each of the defenses to liability contained in Sec. 107(b) "carves out from liability an exception based on causation." 759 F.2d at 1044. A defendant can make out a Sec. 107(b) defense by showing that the substance release was caused solely by an act of God, an act of war, or the unforeseeable act or omission of a third person (other than an employee or agent of the defendant or one whose act occurs in connection with a contractual relationship with the defendant). 42 U.S.C. Sec. 9607(b). Reading into Sec. 107(a) a requirement that the defendant caused the substance release would thus render the Sec. 107(b) defenses surplusage. The Shore Realty court concluded accordingly that a party who cannot make out a Sec. 107(b) defense cannot avoid liability by arguing that it did not cause the substance release.[53] Since Congress made its modification of traditional causation standards clear in the Shore Realty context of the causal relation between a responsible party and a hazardous substance release, we find noteworthy its failure to similarly alter the traditional rules concerning the causal relation between a substance release and the biological injuries alleged to have resulted from it.[54]
 
 
 181
 In sum, while we agree with petitioners that Congress expressed dissatisfaction with the common law as a norm in several areas of damage assessment, we conclude that CERCLA is at best ambiguous on the question of whether the causation-of-injury standard under Sec. 107(a)(C) must be less demanding than that of the common law.[55] Consequently, we uphold Interior's plausible reading of CERCLA as adopting traditional causation standards in this context.
 
 2. The Reasonableness Test
 
 182
 We also reject petitioners' argument that the acceptance criteria are unreasonably stringent. Indeed, it appears that the acceptance criteria will, in some cases, make a government trustee's job of proving causation relatively easy. DOI's listing of the 18 types of biological responses that are deemed to have fulfilled the acceptance criteria will certainly speed recovery in those cases. See 43 C.F.R. Sec. 11.62(f)(4).[56]
 
 
 183
 We consider Interior's acceptance criteria to be a reasonable choice of a standard method for assessing harm to natural resources and to be generally in accord with congressional intent. See S.Rep. No. 848, supra note 10, at 85 (decrying "the absence of a standardized system for assessing [natural resource] damage which is efficient as to both time and cost"). Their strictness may be justified as an attempt to effect Congress' intent that the "best available" methods of assessment be used in a statutory scheme that accords a presumption of correctness to damage assessments conducted in accordance with Interior's rules. Secs. 301(c)(2), 107(f)(2)(C), 42 U.S.C. Secs. 9651(c)(2), 9607(f)(2)(C). Biological responses for which there currently are inadequate data to satisfy the acceptance criteria are not rendered non-actionable by Interior's rules; the rules merely deprive the government trustee in such a case of Sec. 107(f)(2)(C)'s rebuttable presumption.
 
 
 184
 "The acceptance criteria do not require absolute scientific certainty." 51 Fed.Reg. 27,710. It is sufficient that the response have been "predominately" caused by a substance release. Id. The prior studies and proof need not be on a chemical-specific or species-specific basis; the acceptance criteria can be satisfied by studies linking chemically similar substances to injuries in biologically similar species. See 51 Fed.Reg. 27,710.[57]
 
 
 185
 Finally, while Interior's rules appear to require that the field and laboratory studies corroborating the site-specific evidence of biological injury have been published in technical journals,[58] Interior's explanation for that requirement is a reasonable one. In essence, the requirement of "adequate[ ] document[ation] in scientific literature" ensures that decisionmakers will not be misled by the post hoc ergo propter hoc fallacy--the fallacy of assuming that, simply because a biological injury occurred after a spill, it must have been caused by the spill. Interior correctly recognizes that attaching liability to injuries that bear only a speculative causal relationship to a particular substance release would run counter to Congress' desire for a "fair" damage assessment mechanism. S.Rep. No. 848, supra, at 85. Requiring that the site-specific evidence be corroborated by field and laboratory studies published in journals guarantees that scientific conclusions will have been aired publicly and will have been subjected to peer criticism before they are relied on in a CERCLA natural resource damages case. While, in our view, the requirement of publication is unusually stringent, we cannot say that it is an unreasonable policy choice. Consequently, we uphold that aspect of the acceptance criteria in accordance with Chevron 's command.
 
 3. Noncompensability of General Studies
 
 186
 We also reject petitioners' challenge to Interior's contention that the costs of general studies are noncompensable under Sec. 107(a)(C)'s provision for the recovery of reasonable assessment costs. Interior stated in its preamble to the final rules that "it is inappropriate that experimental research studies to advance general scientific understanding be included as a part of a specific natural resource damage claim." 51 Fed.Reg. 27,710. Although petitioners argue that this places an unfair financial burden on state and federal trustees, they do not persuade us that Interior's reading of CERCLA is incorrect or unreasonable. Indeed, Congress considered and rejected a provision that would have provided funding for scientific research concerning, inter alia, "the effects of hazardous substances on living and nonliving resources." S. 1480, 96th Cong., 2d Sess. Sec. 6(a)(1)(I), reprinted in 1 Legislative History, supra note 19, at 524-25. That funding would have come out of Superfund in any event, rather than from the pockets of responsible parties,[59] but it suffices to note that Congress never enacted that version of S. 1480. Petitioners fail to produce any evidence that Congress intended general research on the biological effects of hazardous substance spills to be compensable under the assessment costs provision of Sec. 107(a)(C).
 
 XI. AUDIT REQUIREMENTS
 
 187
 State and Environmental Petitioners challenge Interior's regulations requiring states to adopt a series of accounting and planning procedures that must be used in handling the proceeds from any natural resource damage claims. See 43 C.F.R. Secs. 11.92, 11.93. They argue that DOI exceeded the rulemaking authority granted it in CERCLA, and that the rules usurp state sovereign powers by "micromanag[ing] State accounting and planning procedures." Pet. Br. 86-87.
 
 
 188
 DOI's rulemaking authority derives from Sec. 301(c) of CERCLA, which provides that officials designated by the president "shall promulgate regulations for the assessment of damages for injury to, destruction of, or loss of natural resources resulting from a release of oil or a hazardous substance for the purposes of this chapter." 42 U.S.C. Sec. 9651(c). To be valid, the accounting regulations must be " 'reasonably related to the purposes of the enabling legislation.' " Community for Creative Non-Violence v. Kerrigan, 865 F.2d 382, 385 (D.C.Cir.1989), quoting Mourning v. Family Publications Serv., Inc., 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973). Regulations are in excess of statutory authority "if they 'bear[ ] no relationship to any recognized concept of' the particular statutory terms at issue." Planned Parenthood Federation of America v. Heckler, 712 F.2d 650, 655 (D.C.Cir.1983), quoting Batterton v. Francis, 432 U.S. 416, 428, 97 S.Ct. 2399, 2407, 53 L.Ed.2d 448 (1977). Although petitioners argue that the handling of recovered damages is entirely unrelated to "the assessment of damages," we deem the relationship between the two to be sufficiently close to bringing the regulations under the statutory language.
 
 
 189
 Moreover, the standardization of accounting and planning procedures for recovered damages is a reasonable goal that is entirely consistent with the statutory purpose. CERCLA provides that funds recovered by state trustees can be spent only on restoration, replacement or acquisition of equivalent resources. Sec. 107(f)(1), 42 U.S.C. Sec. 9607(f)(1). Funds cannot be spent until a plan has been developed and adopted by all the affected state and federal authorities. Sec. 111(i), 42 U.S.C. Sec. 9611(i). The legislative history of the 1986 SARA amendments underscores Congress' determination that recovered sums be spent solely on restoration, replacement or acquisition and that expenditures be carefully planned. See H.R.Rep. No. 253(IV), supra note 8, at 49-50, 53. State governments can hardly be heard to complain about intrusion into their sovereign spheres when they seek to recover damages under a federal statute that limits the uses to which those damages can be put. DOI's promulgation of accounting and planning requirements is a perfectly sensible means of ensuring that state trustees obey the statutory command.
 
 XII. PUNITIVE DAMAGES
 
 190
 State and Environmental Petitioners challenge the regulations' failure to provide for the recovery of punitive damages. Arguing that CERCLA does not clearly preclude recovery of punitive damages, petitioners apparently reason from that proposition that Interior must provide for punitive damages. That, of course, misses the point of Chevron. Even accepting petitioners' assertion that Congress did not decide whether punitive damages would be available, petitioners would have to show that DOI's exclusion of punitive damages is unreasonable or contrary to the statutory purpose--a showing that would be difficult to make.
 
 
 191
 The fatal blow to petitioners' position, however, is the evidence that Congress did make a conscious determination that punitive damages would be generally unavailable. CERCLA is replete with indications that Congress intended to provide for compensatory damages only. The most critical indication of this is contained in Sec. 301(c), which provides that the regulations are to identify
 
 
 192
 the best available procedures to determine such damages, including both direct and indirect injury, destruction or loss and shall take into consideration factors including, but not limited to, replacement value, use value, and ability of the ecosystem or resource to recover.
 
 
 193
 42 U.S.C. Sec. 9651(c). There would be no need to establish the "best available procedures" to measure compensatory damages if a rounded-off punitive damages figure could be assessed against a responsible party as well. Further evidence of congressional intent is furnished by the express provision for punitive damages where a responsible party refuses to comply with removal or remedial action orders. See Sec. 107(c)(3), 42 U.S.C. Sec. 9607(c)(3). The fact that Congress provided for punitive damages in that specific context but not in all natural resource damage actions indicates clearly--especially when viewed alongside all the other evidence--that Congress intended the general measure of damages to be compensatory, not punitive. Interior's reading of the statute is correct under the first prong of Chevron, and petitioners' challenge fails.
 
 XIII. CONTINGENT VALUATION
 A. The Regulatory Background
 
 194
 When a natural resource is injured by a discharge of oil or release of a hazardous substance, an authorized official[60] assesses the damages resulting.[61] DOI has prescribed methodologies for estimating in any such instance the amount of money to be sought as recompense. Either DOI's restoration methodology[62] or one of its use methodologies[63] must be employed in calculations of damages.[64] The issue we now address concerns one of the latter.
 
 
 195
 DOI's natural resource damage assessment regulations define "use value" as
 
 
 196
 the value to the public of recreational or other public uses of the resource, as measured by changes in consumer surplus, any fees or other payments collectable by the government or Indian tribe for a private party's use of the natural resource, and any economic rent accruing to a private party because the government or Indian tribe does not charge a fee or price for the use of the resource.[65]
 
 
 197
 The regulations provide several approaches to use valuation. When the injured resource is traded in a market, the lost use value is the diminution in market price.[66] When that is not precisely the case, but similar resources are traded in a market, an appraisal technique may be utilized to determine damages.[67] When, however, neither of these two situations obtains, nonmarketed resource methodologies are available.[68] One of these is "contingent valuation" (CV), the subject of controversy here.
 
 
 198
 The CV process "includes all techniques that set up hypothetical markets to elicit an individual's economic valuation of a natural resource."[69] CV involves a series of interviews with individuals for the purpose of ascertaining the values they respectively attach to particular changes in particular resources. Among the several formats available to an interviewer in developing the hypothetical scenario embodied in a CV survey are direct questioning, by which the interviewer learns how much the interviewee is willing to pay for the resource; bidding formats, for example, the interviewee is asked whether he or she would pay a given amount for a resource and, depending upon the response, the bid is set higher or lower until a final price is derived; and a "take or leave it" format, in which the interviewee decides whether or not he or she is willing to pay a designated amount of money for the resource.[70] CV methodology thus enables ascertainment of individually-expressed values for different levels of quality of resources, and dollar values of individuals' changes in well-being.[71] The regulations also sanction resort to CV methodology in determining "option"[72] and "existence"[73] values.[74]
 
 
 199
 Industry Petitioners'[75] complaint is limited to DOI's inclusion of CV in its assessment methodology.[76] They claim fatal departures from CERCLA on grounds that CV methodology is inharmonious with common law damage assessment principles, and is considerably less than a "best available procedure."[77] These petitioners further charge that DOI's extension of CERCLA's rebuttable presumption to CV assessments is arbitrary and capricious, and violative of the due process rights of a potentially responsible party. We find none of these challenges persuasive.
 
 B. Consistency With CERCLA
 
 200
 Industry Petitioners point out that at common law there can be no recovery for speculative injuries, and they contend that CV methodology is at odds with that principle. CV methodology, they say, is rife with speculation, amounting to no more than ordinary public opinion polling.
 
 
 201
 We have already noted our disagreement with the proposition that the strictures of the common law apply to CERCLA.[78] That much of industry petitioners' argument to the contrary thus fades away. CERCLA does, however, require utilization of the "best available procedures" for determinations of damages flowing from destruction of or injury to natural resources,[79] and Industry Petitioners insist that CV methodology is too flawed to qualify as such. In their eyes, the CV process is imprecise, is untested, and has a built-in bias and a propensity to produce overestimation.
 
 
 202
 It cannot be gainsaid that DOI's decision to adopt CV was made intelligently and cautiously. DOI scrutinized a vast array of position papers and discussions addressing the use of CV.[80] It recognized and acknowledged that CV needs to be "properly structured and professionally applied."[81] It eliminated a feature of CV, as originally proposed, that might have resulted in overly high assessments.[82] We find DOI's promulgation of CV methodology reasonable and consistent with congressional intent, and therefore worthy of deference.
 
 
 203
 The primary argument of Industry Petitioners is that the possibility of bias is inherent in CV methodology, and disqualifies it as a "best available procedure." In evaluating the utility of CV methodology in assessing damages for impairment of natural resources, DOI surveyed a number of studies which analyzed the methodology, addressed the shortcomings of various questionnaires, and recommended steps needed to fashion reliable CV assessments.[83] For example, an early study by the Water Resources Council advised that questions in CV surveys be "carefully designed and pretested,"[84] a warning DOI was quick to heed.[85]
 
 
 204
 Industry Petitioners urge, however, that even assuming that questions are artfully drafted and carefully circumscribed, there is such a high degree of variation in size of the groups surveyed, and such a concomitant fluctuation in aggregations of damages, that CV methodology cannot be considered a "best available procedure."[86] We think this attack on CV methodology is insufficient in a facial challenge to invalidate CV as an available assessment technique. The extent of damage to natural resources from releases of oil and hazardous substances varies greatly, and though the impact may be widespread and severe, it is in the mission of CERCLA to assess the public loss.[87] Certainly nothing in CV methodology itself shapes the injury inflicted by an environmental disaster, or influences identification of the population affected thereby. The argument of Industry Petitioners strikes at CERCLA, not CV's implementation, and can appropriately be considered only by Congress.
 
 
 205
 Similarly, we find wanting Industry Petitioners' protest that CV does not rise to the status of a "best available procedure" because willingness-to-pay--a factor prominent in CV methodology--can lead to overestimates by survey respondents. The premise of this argument is that respondents do not actually pay money, and likely will overstate their willingness-to-pay. One study relied upon by Industry Petitioners[88] hypothesizes that respondents may "respond in ways that are more indicative of what they would like to see done than how they would behave in an actual market,","[89] and also observes that the converse is possible.[90] The simple and obvious safeguard against overstatement, however, is more sophisticated questioning. Even as matters now stand, the risk of overestimation has not been shown to produce such egregious results as to justify judicial overruling of DOI's careful estimate of the caliber and worth of CV methodology.[91]
 
 
 206
 Industry Petitioners' also challenge the use of CV after an oil leak or a hazardous waste release has occurred. They fear that application of CV methodology in those circumstances is fraught with a significant bias leading to overvaluation of the damaged resources. As a practical matter, it would be prohibitively expensive, if not physically impossible, to solicit individual valuations of each and every natural resource, or even a sizeable number thereof, in order to avoid any upward bias in the event that the resource is later damaged. Moreover, in light of CERCLA's preference for restoration, it would be a terrible waste of time and energy to conduct broad-scale valuation interviewing beforehand. While, depending on whether interviewing occurs before or after damage, the results may differ somewhat, that alone does not reduce CV methodology to something less than a "best available procedure." We have no cause to overturn DOI's considered judgment that CV methodology, when properly applied, can be structured so as to eliminate undue upward biases.
 
 
 207
 We sustain DOI in its conclusion that CV methodology is a "best available procedure." As such, its conclusion in the Natural Resource Damage Assessment regulations was entirely proper.
 
 
 208
 C. Presumption of Validity of CV Assessments
 
 
 209
 Industry Petitioners mount two challenges to the rebuttable presumption that CERCLA confers upon natural resource damage assessments.[92] They argue that DOI did not respond fully to their comments regarding CV methodology, with the result that attachment of the presumption to a CV assessment would be arbitrary and capricious. They also contend that inclusion of the presumption is an infringement of a potentially responsible party's due process rights.
 
 
 210
 CERCLA accords a rebuttable presumption to determinations and assessments of damages to natural resources when made "in accordance with [DOI's] regulations."[93] The regulations contain a similar provision.[94] Industry Petitioners charge that DOI did not respond adequately to the criticisms they leveled at CV methodology. They further charge that DOI's justification for the use of CV to measure option and existence values was insufficient, and that the bestowal of the presumption in these circumstances was arbitrary and capricious.
 
 
 211
 A leading concern voiced by Industry Petitioners was that CV had never been employed to assess damages for injury to a natural resource, and the untested and hypothetical nature of CV methodology was also disturbing to them. A second concern that these petitioners believe went unaddressed was that DOI had not delineated when or how CV might be utilized, and thus had left potentially responsible parties without guidance on that score. DOI's response is that it dealt with each in a comprehensive and understandable manner.
 
 
 212
 Agency action is arbitrary or capricious if the agency has
 
 
 213
 relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of a problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference, in view or the product of agency expertise.[95]
 
 
 214
 And when an agency relies upon an economic model, it is incumbent upon it to "provide a full and analytical defense" of the model.[96] Use of a predictive model acknowledges implicitly that there are instances in which various factors will affect the outcome, and the agency must "explain[ ] the assumptions and methodology it used in preparing the model."[97] On the other hand, the agency's choice of model and its application must be respected when the record discloses that the agency "examine[d] the relevant data and articulate[d] a reasoned basis for its decision."[98]
 
 
 215
 In the case before us, CV methodology was thoroughly investigated, comments were analyzed and dealt with, and changes were made to refine the use of CV. The record does not support the claim that DOI's treatment of industry petitioners' comments was arbitrary or capricious.
 
 
 216
 Industry Petitioners also perceive a lack of guidance by DOI on the ways in which CV methodology may be employed. This critique ignores the fact that the scenarios of natural resource damage are myriad. DOI responded to comments on CV, including those seeking more information on utilization of CV methodology.[99] As DOI explained, the propriety and form of CV is largely shaped by the nature and extent of the environmental mishap.[100] For example, a representative population for survey purposes cannot be determined prior to damage to a resource; only the scope of an accident will provide the information needed to design a survey covering the population.[101] The physical area damaged may also weigh in the determination of whether to conduct in-person, telephone, or mail surveys,[102] though DOI has expressed a preference for in-person interviews.[103] In sum, DOI recognized the need for flexibility and a case-by-case approach to surveys, and concluded that CV methodology could be utilized as a "valid, proven technique[ ] when properly structured and professionally applied."[104] We find that the regulations provide sufficient guidance concerning the use of CV.
 
 
 217
 We perceive no greater merit in Industry Petitioners' substantive and procedural due process assaults upon attachment of the rebuttable presumption to CV assessments pursuant to DOI's regulations. The substantive due process challenge has not surmounted the presumption of constitutionality afforded statutes affecting economic regulation. As the Supreme Court has declared,
 
 
 218
 [i]t is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.[105]
 
 
 219
 We see nothing arbitrary or irrational about the rebuttable presumption conferred upon natural resource assessments, including those utilizing CV methodology. On the contrary, the procedures preconditioning damage assessments[106] support the logic of the presumption, without which would loom the specter of prolonged battles of experts and other heavy burdens on the calendars of adjudicating tribunals.
 
 
 220
 The procedural due process claim concentrates on the role of the authorized official[107] in damage assessment proceedings. Deeming the official an interested party with discretionary power to exclude potentially responsible parties from the assessment process, Industry Petitioners assert a violation of their procedural due process rights in light of the presumption accorded CV assessments. To be sure, the official is under a duty to assess the injury to natural resources and collect damages therefor, and to that extent he or she is an interested party. We do not agree, however, that potentially responsible parties will be totally excluded from participation in the proceedings forerunning a damage determination.[108] Nor do we agree that the coupling of the rebuttable presumption to a CV damage determination contravenes procedural due process standards.
 
 
 221
 Industry Petitioners bottom their due process thesis on United Retail & Wholesale Employees v. Yahn & McDonnell, Inc.,[109] wherein the Third Circuit invalidated a provision of the Multiemployer Pension Plan Amendments of 1980[110] which conferred a rebuttable presumption of validity upon the amount determined by pension fund trustees to be owing by a withdrawing employer. The court found a conflict of interest arising from the fact that "as fiduciaries of the plan, trustees have a natural inclination and may even consider it a duty to maximize the fund by extracting as much money as possible from withdrawing employers."[111] Additionally, the trustees would become personally liable if the plan were not adequately funded, and naturally had an interest in protecting themselves.[112] The case before us is quite different. Authorized officials without fault do not become personally liable should damages assessed or recovered turn out to be inadequate, nor do they have any other sort of personal stake in the determination or recovery. The purpose of such an assessment is to ascertain the amount of compensation due the public for an injury to the public's natural resources, and all sums recovered must be devoted to restoration of damaged resources or acquisition of equivalents.[113] We conclude that Industry Petitioners' procedural due process challenge must fail.
 
 XIV. CONCLUSION
 
 222
 DOI's Type B Natural Resource Damage Assessment Regulations are upheld on review as to the following issues: the "committed use" requirement (Part V), the adoption of a ten percent discount rate (Part VII), the treatment of potentially responsible parties (Part VIII), the limitation on recovery of assessment costs (Part IX), the acceptance criteria (Part X), the audit requirements (Part XI), the unavailability of punitive damages (Part XII), and the adoption of contingent valuation methodology (Part XIII). We grant the petition for review with respect to the "lesser of" rule (Part III) and the hierarchy of assessment methods (Part VI). We also remand the public ownership rule (Part IV) for DOI's reasoned consideration and explanation. We instruct DOI to proceed as expeditiously as possible in issuing new regulations in conformance with this opinion.
 
 
 223
 It is so ordered.
 
 
 
 [1]
 Parts I, II, III, IV, VII, VIII, IX, X, XI and XII were authored by Judge Wald. Part XIII was authored by Judge Robinson. Parts V and VI were authored by Judge Mikva
 
 
 [2]
 The natural resource damage regulations are codified at 43 C.F.R. Secs. 11.10-11.93 (1987)
 
 
 [3]
 Liability may also be to an Indian tribe for certain resources. Sec. 107(f)(1), 42 U.S.C. Sec. 9607(f)(1)
 
 
 [4]
 See U.S. Dept. of the Interior, "Measuring Damages to Coastal and Marine Natural Resources," vol. 1 at p. V-37 (mandating $15 figure for valuation under Type A rules); see also 52 Fed.Reg. 9,092 (1987) (stating that $15 value is consistent with valuation principles of Type B rules)
 
 
 [5]
 See Interagency Land Acquisition Conference, "Uniform Appraisal Standards for Federal Land Acquisitions" 9 (1973), Joint Appendix ("J.A.") 273; see also 43 C.F.R. Sec. 11.83(c)(2)
 
 
 [6]
 Although this formulation of the precise question at issue might be viewed as a narrow one, we remind that the Chevron Court itself cast the precise question at issue in that case in narrow terms as well. Chevron concerned the validity of an EPA regulation that treated all pollution-emitting devices within a given industrial grouping as though they were encased in a single "bubble," for purposes of deciding whether the installation or modification of one such device triggered a statutory requirement that a permit be obtained "for the construction and operation of new or modified major stationary sources." 467 U.S. at 839-40, 104 S.Ct. at 2780. The Chevron Court did not ask whether Congress addressed the question of what is a "stationary source[ ]" within the meaning of the amended Clean Air Act, 42 U.S.C. Sec. 7502(b)(6). Rather, it asked whether "Congress ... actually ha[d] an intent regarding the applicability of the bubble concept to the permit program." 467 U.S. at 845, 104 S.Ct. at 2783 (emphasis added)
 
 
 [7]
 This can be inferred from Sec. 301(c)(2) of CERCLA. First, that provision delegates to the President the duty to formulate a measure of damages, which suggests some degree of latitude in deciding what measure shall apply. Second, it states that the regulations "shall take into consideration factors including, but not limited to, replacement value, use value, and ability of the ecosystem or resource to recover." Sec. 301(c)(2), 42 U.S.C. Sec. 9651(c)(2). That suggests that DOI is permitted to apply use value in some cases and restoration cost in others (and both in yet others). See also 132 Cong.Rec. H9613 (daily ed. Oct. 8, 1986) (statement of Rep. Jones) ("Where, of course, restoration is technically impossible or the costs thereof are grossly disproportionate to the value of the resources to society as a whole, then other valuation measures, both market and nonmarket, must be used."). Scholars agree that recovery of full restoration cost in every case, no matter how large the sum is, is not required by CERCLA. See Anderson, Natural Resource Damages, Superfund, and the Courts, 16 B.C.Envtl.Aff.L.Rev. 405, 446 (1989); Cross, Natural Resource Damage Valuation, 42 Vand.L.Rev. 269, 301, 329 (1989); Breen, CERCLA's Natural Resource Damage Provisions: What Do We Know So Far?, 14 Envtl.L.Rep. 10,304, 10,309-10 (1984). DOI obviously has some latitude in deciding which measure applies in a given case: the rule might for instance hinge on the relationship between restoration cost and use value (e.g., damages are limited to three-times the amount of use value), or it might hinge on the ability of the resource to recover (e.g., use value is the measure whenever restoration is infeasible). DOI has not, however, fashioned its rules along these lines
 
 
 [8]
 Although at first glance these two sentences might seem inconsistent, a closer look reveals that the missing link is the absence of the phrase "or acquire the equivalent" in the latter sentence. This suggests (and the legislative history confirms) that damages recovered in excess of restoration or replacement costs must be spent on acquiring the equivalent of lost resources. See H.R.Rep. No. 253(IV), 99th Cong., 1st Sess. 50 (1985); see also infra p. 454 & n. 34
 
 
 [9]
 See, e.g., 132 Cong.Rec. at H9613 (daily ed. Oct. 8, 1986) ("[The] purpose of the regime, rather, is to make whole the natural resources that suffer injury from releases of hazardous substances.") (remarks of Rep. Jones); 126 Cong.Rec. 30942 (1980) ("[W]e do not want damage to natural resources to await the workings of that [common-law tort litigation] process; we want prompt, full compensation in such cases so we can replant trees in the park....") (remarks of Sen. Mitchell). Underscoring its intent to accomplish full restoration, Congress in 1980 provided that government trustees could recover restoration costs from Superfund whenever efforts to recover from responsible parties failed (for example, in a secret "midnight dumping" case where the responsible party cannot be determined, or where the responsible party is insolvent). See Sec. 111(c)(2), (b)(2)(A), 42 U.S.C. Sec. 9611(c)(2), (b)(2)(A); see infra note 11
 
 
 [10]
 See, e.g., S.Rep. No. 848, 96th Cong., 2d Sess. 13 (1980), 1980 U.S.Code Cong. & Admin.News 6119:
 The goal of assuring that those who caused chemical harm bear the costs of that harm is addressed in the reported legislation by the imposition of liability. Strict liability, the foundation of S. 1480, assures that those who benefit financially from a commercial activity internalize the health and environmental costs of that activity into the costs of doing business.
 See also id. at 31 ("Since S. 1480 is designed to assure that products reflect their true costs, the bill is at its most efficient when such actual costs [imposed by hazardous substance releases] are calculated to the penny."); 126 Cong.Rec. 30941 (1980) ("The guiding principle of those who wrote S. 1480 was that those found responsible for harm caused by chemical contamination should pay the costs of that harm.") (remarks of Sen. Mitchell).
 
 
 [11]
 DOI states that federal or state agencies "are not precluded from supplementing damage funds with other monies to restore, replace, or enhance the injured natural resource." 51 Fed.Reg. 27,705. Those "other monies," however, cannot come from Superfund, as the enactment of SARA in 1986 cut off the availability of Superfund money for restoration of injured natural resources. See SARA Sec. 517(a), Pub.L. No. 99-499, 100 Stat. 1772 (1986), codified at 26 U.S.C. Sec. 9507(c)(1)(A)(ii) (Superfund money to be available "only" to carry out the purposes of, inter alia, "section 111(c) of CERCLA ... other than paragraphs (1) and (2) thereof ") (emphasis added); cf. CERCLA Sec. 111(c)(2), 42 U.S.C. 9611(c)(2) (providing for Superfund expenditures on restoration of injured resources)
 
 
 [12]
 Interior's regulations provide that, when restoration costs are the "lesser" of the two possible measures, the trustee may recover not only restoration costs but also damages for "the diminution of use values during the period of time required to obtain restoration or replacement." 43 C.F.R. Sec. 11.84(g)(1)
 
 
 [13]
 Commentators are unanimous in predicting that applying the "lesser of" rule will invariably favor the use value standard. See, e.g., Cross, supra note 7, at 307 ("Only about five percent of some resources, such as plants and animals, possess an established economic value."); Anderson, supra note 7, at 442; Kenison, Buchholz & Mulligan, State Actions for Natural Resource Damages: Enforcement of the Public Trust, 17 Envtl.L.Rep. 10,437-39 (1987). The Anderson article points out that Interior's own strict definition of what "uses" will be recognized for damage purposes guarantees that "lost use" will almost always be the chosen measure. Anderson, supra, at 442
 
 
 [14]
 Industry Intervenors advance a related argument, to the effect that Congress' choice of the word "damages" in Sec. 107(a)(C) should be read to incorporate the common-law meaning of the term. In the first place, this argument loads a great deal of baggage onto an everyday word which has long since transcended its origins and is now defined in Webster's Dictionary as "compensation in money imposed by law for loss or injury." Webster's New Collegiate Dictionary 286 (1977). Moreover, as our examination of CERCLA's legislative history indicates, see infra pp. 454-56, Congress' dissatisfaction with the common law provided a central motivation for enacting CERCLA
 
 
 [15]
 Industry Intervenors tried rephrasing the point at oral argument, but without success. Counsel argued that the "measure of damages" provision of Sec. 107(f)(1) does not expand on the "categories of recoverable cost" set forth in Sec. 107(a)(C). This of course harks back to the expressio unius treatment accorded Sec. 107(a)(C)'s mention of assessment costs, which we find unconvincing for reasons already stated. At any rate, Sec. 107(a)(C) makes no mention of "categories of recoverable cost" or anything of the sort. Industry Intervenors' attempt to identify an ambiguity in this aspect of the statute fails
 
 
 [16]
 The legislative history makes it clear that amounts recovered in excess of restoration cost are to be spent on acquiring equivalent resources. See infra p. 454 & n. 34
 
 
 [17]
 See S.Rep. No. 848, supra note 10, at 13 (purpose of fund is to finance response actions "where a liable party does not clean up, cannot be found, or cannot pay the costs of cleanup and compensation"); id. at 16 (existing statutes are inadequate "to deal with abandoned and inactive sites or with new cases of 'midnight dumping' onto the ground"); id. at 80 (purpose of fund is "to assure prompt payment of valid claims where the claimant has been unable to obtain satisfaction from a liable party"); 126 Cong.Rec. 30932 (1980) (fund to pay cleanup costs and mitigate damages "where a liable party does not clean up or cannot be found") (remarks of Sen. Randolph)
 
 
 [18]
 See supra note 11
 
 
 [19]
 CERCLA's legislative history supports this interpretation. The Senate CERCLA report states:
 Monies from the Fund should be available to a State or the appropriate Federal agencies for use to restore, rehabilitate, or acquire the equivalent of such resources which have been injured, lost or destroyed. It should be noted, however, that in a case where the election to pursue an action in court is chosen, the measure of such resource damages shall not be limited to the sums which can be used to restore or replace such resources.
 S.Rep. No. 848, supra note 10, at 84-85.
 Industry Intervenors dismiss this passage in the Senate report as "address[ing] a component of the bill that was never passed." Ind.Int.Br. 16. This is untrue. Although subsections (a)(2)(D) and (a)(2)(E) of Sec. 4 of S. 1480 were never passed, the right of state and federal government trustees to recover was expressly authorized "under subsection (a)(2)(C) of this section"--the one subsection of the three that was eventually enacted in CERCLA. S. 1480, Sec. 4(b), reprinted in 1 Senate Comm. on Environment and Public Works, 97th Cong., 2d Sess., A Legislative History of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 488 (Comm. Print 1983) [hereinafter "Legislative History "]. The passage in the Senate report addresses subsection (C), not subsections (D) and (E).
 
 
 [20]
 In bargaining between rational actors, any settlement reached before trial will normally lie between the lower limit of potential liability ($0, which represents a finding of no liability) and the upper limit of potential liability (under DOI's rule, this will be the "lesser of" use value or restoration cost). Each party will thus achieve its goal of averting the risk of an adverse judgment, because the amount paid by the defendant to the plaintiff will lie somewhere between the two possible extremes that could result from a trial. The amount within that range that the parties will settle on depends partly on their prediction as to the likelihood of a verdict relieving the defendant of liability entirely or awarding damages in an amount smaller than the upper limit of potential liability
 Of course, the foregoing analysis omits transaction costs--such as lawyers' fees and down-time caused by litigation--which the defendant will add to the upper limit of its potential liability when deciding whether to make or accept a particular settlement offer. Given this, it is conceivable that a rational defendant would settle for an amount greater than the maximum potential damages award. Yet this would only happen where the defendant foresaw litigation burdens so enormous that, even after factoring in the likelihood of a verdict relieving him of liability entirely or awarding an amount less than the maximum potential award, acceding to the high settlement amount would be the least costly avenue for the defendant to take.
 Interior's "lesser of" rule, on the other hand, envisions a scheme in which a defendant would accept a settlement figure (i.e., restoration cost) vastly greater than the amount it stands to lose at trial (i.e., use value). Given that the difference could often run into millions of dollars, it is difficult to see why Congress would construct such a scenario if it wanted to encourage settlement.
 
 
 [21]
 Counsel for Interior argues that Sec. 122(j)(2) is not a measure-of-damages provision. This is a debater's point. Section 122(j)(2) is important because it reinforces the message of Sec. 107(f)(1), which by its own terms is a measure-of-damages provision
 
 
 [22]
 Subsections 311(f)(4) and (f)(5) were added to the Federal Water Pollution Control Act in 1977. Pub.L. No. 95-217, Sec. 58(g), 91 Stat. 1566 (1977)
 
 
 [23]
 See Commonwealth of Puerto Rico v. S.S. Zoe Colocotroni, 628 F.2d 652, 673 (1st Cir.1980), cert. denied, 450 U.S. 912, 101 S.Ct. 1350, 67 L.Ed.2d 336 (1981)
 
 
 [24]
 See S.Rep. No. 848, supra note 10, at 84-85 ("Monies from the Fund should be available to a State or the appropriate Federal agencies for use to restore, rehabilitate, or acquire the equivalent of such resources which have been injured, lost or destroyed. It should be noted, however, that in a case where the election to pursue an action under this legislation in court is chosen, the measure of such resource damages shall not be limited to the sums which can be used to restore or replace such resources.") (emphasis added); id. at 85 ("It should be noted that the Committee intended that actions to restore, rehabilitate, or replace natural resources under the provisions of this Act be accomplished in the most cost-effective manner possible.") (emphasis added); id. ("[N]o restoration action concerning resource damage may take place until a plan outlining the steps to be taken has been developed and adopted....") (emphasis added); id. ("The process of developing such a plan will be of great assistance in avoiding unnecessary costs involved in restoring, rehabilitating, or replacing natural resources.") (emphasis added)
 
 
 [25]
 See, e.g., 126 Cong.Rec. 21377 (1980) ("The most important aspect of this bill from a national viewpoint is the provision of funds for the restoration, rehabilitation and replacement of natural resources.") (remarks of Sen. Gravell) (emphasis added); id. at 30941 (responsible parties to be liable for "[l]oss or damage to natural resources ... including the cost of restoring injured or destroyed natural resources") (remarks of Sen. Mitchell) (emphasis added); id. ("Under this bill, if a toxic waste discharge injures both a tree and a person, the tree's owner, if it is a government, can promptly recover from the fund for the cost of repairing the damage, but the person cannot.") (remarks of Sen. Mitchell) (emphasis added); id. at 30942 ("we want prompt, full compensation in such cases so we can replant the trees in the park") (remarks of Sen. Mitchell) (emphasis added); id. at 30970 ("The legislation will provide for the restoration of natural resources which have been damaged....") (remarks of Sen. Williams) (emphasis added); id. at 30971 ("[t]he provision ... for the restoration of damaged natural resources remains in the legislation we are considering today") (remarks of Sen. Chafee) (emphasis added)
 
 
 [26]
 The House concurred in the Senate version of the bill without amendment. 126 Cong.Rec. 31981 (1980)
 
 
 [27]
 See CERCLA Sec. 107(a)(C), 42 U.S.C. Sec. 9607(a)(C) (establishing liability for "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release"). Only government trustees could recover the damages described in subsection (C), both under the original language of the bill, S. 1480, 96th Cong., 2d Sess. Sec. 4(b), reprinted in 1 Legislative History, supra note 19, at 488, and under CERCLA as enacted, Sec. 107(f)(1), 42 U.S.C. Sec. 9607(f)(1)
 
 
 [28]
 Curiously, Industry Intervenors derive a very different meaning from the history of S. 1480. They argue that the deletion of the "loss of use" language of (D) means there can be no "additional and separate recovery for loss of use." Ind. Int. Br. 15. (Interior also adopted this view at oral argument, although it is inconsistent with Interior's own regulations, which provide for the recovery of both restoration cost and interim lost-use value in some cases. See 43 C.F.R. Sec. 11.84(g)(1).) This argument is flawed by its failure to recognize that (D) and (E) listed lost-use and lost-profit damages separately for a reason: in contrast to the damages available only to government trustees under subparagraph (C), the damages under (D) and (E) were to be made available to private parties. The significance of S. 1480's early formulation lies not in the subsequent deletion of subparagraphs (D) and (E); rather, the existence of (C), (D) and (E) side by side in an early draft of CERCLA shows that Congress always considered subparagraph (C)--ultimately enacted into CERCLA--to state a broad measure of damages encompassing, in the majority of cases at least, restoration costs
 
 
 [29]
 The regulations under OCSLA, which were promulgated by the Coast Guard, explicitly recognize that damages under 43 U.S.C. Sec. 1813(a)(2)(C) consist of the following:
 (1) The cost to restore, rehabilitate, or acquire the equivalent of the natural resource; and
 (2) Any additional associated economic loss actually suffered.
 
 
 [33]
 C.F.R. Sec. 136.217 (1988)
 
 
 [30]
 One commentator has suggested that the 1986 comments "were not contemporaneous with the passage of damage valuation authority and [thus] are postenactment legislative history." Cross, supra note 7, at 329-30 n. 329. Yet the 1986 comments are not postenactment in the usual sense of the term. They were voiced during consideration of a measure that amended and reenacted the entire CERCLA statute. More specifically, SARA amended Sec. 107(f)(1), which contains the limitations on the uses of recovered damages and the "shall not be limited by" passage. While one might suggest that SARA left the operative words in place and made changes that are not significant for purposes of measuring damages, see Cross, supra, at 330 n. 329, a key House report sets out the SARA sponsors' view that the statute, both as enacted in 1980 and as amended, clearly had restoration as its "primary purpose." H.R.Rep. No. 253(IV), supra note 8, at 50. We read the report as indicating that Congress made a conscious decision not to amend the operative language of Sec. 107(f)(1) because it was deemed "clear" all along. Id. We think it would be misguided to dismiss that report as mere postenactment history
 
 
 [31]
 Although the challenged rules had not yet been published in the Federal Register when the House report was issued in October 1985, Interior had by that time drafted and publicly discussed the "lesser of" rule. See "Type B Technical Information Document: Techniques to Measure Damages to Natural Resources" (Public Review Draft) (1985), J.A. 468, 488-90
 
 
 [32]
 Interior disagrees sharply with State and Environmental Petitioners over the degree of importance that should be ascribed to floor statements made by various legislators during consideration of SARA. As Interior points out, more than one House member complained that certain Senators had made floor statements, in support of a conference committee version of SARA, in which they related "what the legislation might have said or what they wish it said." 132 Cong.Rec. H9563 (daily ed. Oct. 8, 1986) (statement of Rep. Dingell). On this basis, Interior urges us to accord no credence to the views expressed by those vocal critics of the "lesser of" rule. In fact, we rely on other aspects of SARA and its legislative history as establishing the invalidity of the "lesser of" rule
 
 
 [33]
 SARA also divided the original single sentence containing the "shall not be limited by" language and the restriction on the uses of recovered damages into three sentences, in order to provide that funds recovered by the federal government need not receive further congressional appropriation before being spent on restoration of injured resources. The language of CERCLA as enacted in 1980 was as follows:
 Sums recovered shall be available for use to restore, rehabilitate, or acquire the equivalent of such natural resources by the appropriate agencies of the Federal Government or the State government, but the measure of damages shall not be limited by the sums which can be used to restore or replace such resources.
 Sec. 107(f), 42 U.S.C. Sec. 9607(f) (prior to amendment). The language as amended by SARA provides as follows:
 Sums recovered by the United States Government as trustee under this subsection shall be retained by the trustee, without further appropriation, for use only to restore, replace, or acquire the equivalent of such natural resources. Sums recovered by a State as trustee under this subsection shall be available for use only to restore, replace, or acquire the equivalent of such natural resources by the State. The measure of damages in any action under subparagraph (C) of subsection (a) of this section shall not be limited by the sums which can be used to restore or replace such resources.
 Sec. 107(f)(1), 42 U.S.C. Sec. 9607(f)(1).
 
 
 [34]
 As the report indicates, Congress intended that trustees in some cases be permitted to recover damages greater than the sum required to restore the resource. The excess would represent interim use value, the value of the lost uses from the time of the spill until the completion of the restoration project. At the same time, Congress required that all the funds nonetheless be spent on restoration, replacement or acquisition of an equivalent resource. Sec. 107(f)(1), 42 U.S.C. Sec. 9607(f)(1). Interior apparently has difficulty accepting this premise, see Resp.Br. 33, but it is dictated by the plain terms of CERCLA, and the House Committee on Merchant Marine and Fisheries report indicates that it was part of a conscious design. That report states that the excess over restoration costs must be used to acquire the equivalent of the damaged resource--even though the original resource will eventually be restored. H.R.Rep. No. 253(IV), supra note 8, at 50. Perhaps the committee intended the "equivalent" resource to stand in for the injured one while restoration was underway, in light of the fact that some resources such as mature forests might require many years to restore. At any rate, what matters for our purposes is that the statute and its legislative history indicate that Congress intended damages to at least cover restoration costs
 
 
 [35]
 Indeed, if the committee did not think that the recovery should exceed restoration costs, one wonders why the report immediately goes on to stipulate how those "excess funds recovered shall be used."
 
 
 [36]
 This impression is strengthened by the fact that Congress in 1986 enacted for the first time the settlement provision and the double-recovery provision. As indicated above, those provisions are cast in such a way as to dictate the assumption that Congress intended responsible parties to be liable for restoration costs
 
 
 [37]
 We note in passing that the "lesser of" standard does not apply in all non-CERCLA contexts. See, e.g., Denoyer v. Lamb, 22 Ohio App.3d 136, 490 N.E.2d 615, 618-19 (1984) (restoration cost is proper measure where property is used for a residence or for recreation, so long as restoration cost is not "grossly disproportionate" to diminution in market value); Heninger v. Dunn, 101 Cal.App.3d 858, 162 Cal.Rptr. 104, 106-09 (1980) (restoration cost is proper measure where owner has a personal reason for restoring land to its original condition, so long as restoration cost is not unreasonably disproportionate to diminution in market value); Restatement (Second) of Torts Sec. 929, comment b (1977)
 
 
 [38]
 See, e.g., S.Rep. No. 848, supra note 10, at 13-14 ("[T]raditional tort law presents substantial barriers to recovery.... [C]ompensation ultimately provided to injured parties is generally inadequate."); H.R.Rep. No. 172(I), 96th Cong., 1st Sess. 17 (1979) ("Common law remedies [are] ... inadequate to compensate victims in a fair and expeditious manner"); 126 Cong.Rec. 26347 (1980) ("Existing environmental, common, compensatory, and liability laws are not adequate ... [and] provide little or no relief for cleanup and compensation.") (remarks of Rep. Weiss)
 
 
 [39]
 See Sec. 107(a)(C), 42 U.S.C. Sec. 9607(a)(C) (assessing liability for "the reasonable costs of assessing such injury, destruction, or loss"); S.Rep. No. 848, supra note 10, at 85-86 (damage assessments and restoration actions to be accomplished "in the most cost-effective manner possible")
 
 
 [40]
 This skepticism is shared by many scholars. See, e.g., Anderson, supra note 7, at 443 ("Direct consumer behavior will not produce prices if resources are not directly traded in markets, which is often the case with resources for which damages under the Superfund may be recovered."); id. at 451 ("[T]he difficulty [of a lesser-of rule] is that environmental damage computations and selection of damage assessment methodologies involve great uncertainty. Lost use value is a difficult concept to define even qualitatively, but an even greater problem comes in quantifying the lost use values."); Cross, supra note 7, at 307-08, 325; Breen, supra note 7, at 10,307 (Estimates of use value as being smaller than restoration cost "may sometimes be the result of the market failing to value important ecological attributes.... [The use value] measure may ignore the 'consumer surplus' involved--the difference between what the user would be willing to pay and the good's price.")
 Cross explains how the use of restoration cost as a presumptive measure of damages does not repudiate the goal of economic efficiency:
 At first glance, restoration cost appears to be inferior, because it is a cost-based, supply-side measure, rather than a demand-side, value-based measure of natural resource value. For this reason, when natural resource economics advances far enough to provide an adequate demand-side measure, reliance on restoration cost will become inappropriate. At present, however, the economic tools for valuing natural resources are of questionable accuracy.... [Using restoration cost as the measure of damages] acknowledges the current ignorance of economic valuation of resources by adopting a cautious, preservationist approach.
 Cross, supra, at 331-32. Others agree that restoration cost can generally be estimated more accurately and easily than can the value of an injured resource. See Anderson, supra, at 442, 445; Breen, supra, at 10,307.
 
 
 [41]
 See, e.g., Trinity Church v. John Hancock Mut. Life Ins. Co., 399 Mass. 43, 502 N.E.2d 532, 536 (1987) (restoration cost is proper measure where diminution in market value is unsatisfactory or unavailable as a measure of damages, as in the case of structural damage to a church); Weld County Bd. of Comm'rs v. Slovek, 723 P.2d 1309, 1316-17 (Colo.1986) (court may, in its discretion, award restoration cost where award of diminution in market value would not adequately compensate owner for some personal reason, provided that restoration cost is not "wholly unreasonable" in relation to diminution in value); see also supra note 37
 
 
 [42]
 Before Interior promulgated its "lesser of" rule, Interior's own staff recognized that the pursuit of economic efficiency does not necessarily mean that restoration should be avoided whenever its costs exceed the economic value of a resource. See J.A. 2061. Recognizing CERCLA's "strong bias towards restoration," a 1985 draft paper on the assessment of natural resource damages argued that in the case of natural resources committed to specific uses by law (such as parks, wilderness areas and wildlife refuges), restoration is "economic[ally] feasib[le]" whenever restoration costs are not "significantly greater than the economic value of the resource." J.A. 2063-64 (emphasis added). This view was incorporated into the proposed rules, which would have established a class of "special resources" to which the "lesser of" rule would not apply; instead, restoration cost would be recoverable so long as restoration were feasible at a cost not "grossly disproportionate to the benefits gained." 50 Fed.Reg. at 52,154. This rule ultimately was rejected in favor of blanket application of the "lesser of" rule to all natural resources. 51 Fed.Reg. at 27,725
 
 
 [43]
 One might wonder why CERCLA Sec. 107(f)(1) uses the phrase "within the State" at all, especially since it is followed immediately by the words "or belonging to, managed by, controlled by, or appertaining to such State." State and Environmental Petitioners advance a theory that the phrase "held in trust by" appears only in Sec. 101(16) while the phrase "within the State" appears only in Sec. 107(f)(1). They infer from this that Congress believed the two to be synonymous; i.e., all privately owned land within a state is deemed to be held in trust by that state
 For reasons set out below, we do not believe Congress held such a view. Rather, the expression "within the State" permits a state to recover damages not only for resources owned by, managed by, appertaining to or otherwise controlled by the state government, but also for resources owned by, managed by, appertaining to or otherwise controlled by a local government or a foreign government--if those resources exist "within the State." This makes sense because the definition of "natural resources" in Sec. 101(16) includes resources appertaining to local and foreign governments, while the liability provision of Sec. 107(f)(1) does not empower those governments to bring actions for damages.
 
 
 [44]
 See Breen, supra note 7, at 10,305-06
 
 
 [45]
 Ordinary interest rates include an inflation-compensation component which will account for changes in the future cost of natural resource restoration or replacement due solely to a change in the general price level
 
 
 [46]
 We note that we are merely deferring to DOI's choice of the 10 percent figure; DOI is free to revise the discount rate at some future time, so long as it sets forth a reasonable justification for doing so
 
 
 [47]
 See 43 C.F.R. Sec. 11.84(d) (providing that "significant uncertainties concerning the assumptions made in all phases of the assessment process" should be taken into account and alternative assumptions should be considered for the purpose of arriving at a damages figure); see also 51 Fed.Reg. 27,722 (explaining Sec. 11.84(d))
 
 
 [48]
 Petitioners also argue that the DOI rules create the possibility that there will be one administrative record for those "in the know" and another for the general public. Pet.Br. 75-76. Yet the regulations provide for one record, which must contain documentation of all significant decisions made as well as public comments and responses to those comments. See 43 C.F.R. Secs. 11.32(c), 11.32(e), 11.90
 
 
 [49]
 Moreover, even if a state trustee spends more on an assessment than 43 C.F.R. Sec. 11.14(ee) permits it to recover, the trustee can nonetheless recover the amount of "reasonable costs" as defined by that rule. Thus, the trustee will have to pick up the tab, unreimbursed, for only the amount in excess of "reasonable costs."
 
 
 [50]
 In addition to these "viability" injuries, a biological resource can be deemed injured if the concentration of the hazardous substance in the organisms exceeds federal food and drug standards or state health standards for edible organisms
 
 
 [51]
 The Congressional Research Service study was commissioned by two Senate sponsors of CERCLA and was cited in the Senate Report accompanying S. 1480. S.Rep. No. 848, supra note 10, at 320-21 & n. 4
 
 
 [52]
 Responsible parties include past and present owners of vessels and facilities; persons who arrange for the disposal, treatment or transport of hazardous substances; and transporters of hazardous substances. Sec. 107(a), 42 U.S.C. Sec. 9607(a)
 
 
 [53]
 The Shore Realty court also found evidence in the legislative history to bolster its conclusion. See 759 F.2d at 1044-45. The Shore Realty holding has found wide acceptance in the courts. See, e.g., United States v. Miami Drum Services, 25 Envtl.Rep.Cas. (BNA) 1469, 1986 WL 15327 (S.D.Fla.1986); United States v. South Carolina Recyclying and Disposal, Inc., 653 F.Supp. 984 (D.S.C.1984)
 
 
 [54]
 Petitioners refuse to acknowledge a difference between these two types of causation. See Reply Br. 37 n. 26 (arguing that "the operative [statutory] language" is the same in both contexts). In this they are mistaken. The Shore Realty line of cases involves the causal link between the defendant's acts and the substance release. The operative language is the "from which there is a release" phrase of Sec. 107(a) and the contrasting language of Sec. 107(b), which establishes defenses based on a showing that "the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by" an act of God, an act of war, or the unforeseeable acts of an unrelated third party. 42 U.S.C. Sec. 9607(b). The issue in the present case involves the causal link between the substance release and the biological injuries alleged to have resulted from it. The operative language here is that of Sec. 107(a)(C), which establishes liability for "injury to, destruction of, or loss of natural resources ... resulting from such a release." 42 U.S.C. Sec. 9607(a)(C). Shore Realty does not address the issue presented in this case
 
 
 [55]
 This ambiguity is not resolved in petitioners' favor by a floor comment made by a sponsor of SARA in 1986. See 132 Cong.Rec. S14931 (daily ed. Oct. 3, 1986) (remarks of Sen. Baucus). Although Senator Baucus criticized the acceptance criteria as "inordinately stringent," id., SARA did not amend any of the CERCLA provisions pertaining to the causation-of-injury standard. (Nor is this an instance, as with the "lesser of" rule, where Congress made it clear that its failure to amend the operative language stemmed from its belief that the statutory language was clear all along. Cf. supra pp. 452-55.) Given that SARA left the relevant provisions unchanged, and given that the history of CERCLA's original passage in 1980 suggests Congress did not intend to diverge from the common-law causation-of-injury standard, Senator Baucus' 1986 comment does not compel the conclusion that the Act unambiguously requires a liberalization of traditional causation analysis
 
 
 [56]
 Interior's rules do not limit the acceptance criteria to those 18 types of biological responses. A government trustee is free to develop its own list of biological responses that meet the acceptance criteria
 
 
 [57]
 The possibility that scientific studies could make such substitutions and still fulfill the acceptance criteria should allay petitioners' concern that studies could never be performed on endangered species because doing so would involve harming some of the few remaining members of the species
 
 
 [58]
 We do find the rules somewhat unclear as to exactly what, if anything, must have been published to be considered reliable under the rules. The acceptance criteria require that "the biological response measurement must be adequately documented in scientific literature." 43 C.F.R. Sec. 11.62(f)(2)(iv). The preamble to the rules states that the acceptance criteria are designed to reject "biological responses for which a paucity of information exists in the technical literature." 51 Fed.Reg. 27,710. The preamble also states, in relation to the field and laboratory studies required by subparagraphs (ii) and (iii), that "[t]he Department recognizes the technical merit of the peer review process for publication of research findings." Id
 
 
 [59]
 S. 1480 was proposed in 1980, long before SARA added the Sec. 111(b)(2) requirement that a trustee exhaust all efforts at obtaining the amount of a Superfund claim from parties who are liable under Sec. 107
 
 
 [60]
 " 'Authorized official' means the Federal or State official to whom is delegated the authority to act on behalf of the Federal or State agency designated as trustee, or an official designated by an Indian tribe, pursuant to section 126(d) of CERCLA, to perform a natural resource damage assessment." 43 C.F.R. Sec. 11.14(d) (1988). See also CERCLA Sec. 107(f)(2), 42 U.S.C. Sec. 9607(f)(2) (Supp. IV 1986)
 
 
 [61]
 43 C.F.R. Sec. 11.80(a)(1) (1988)
 
 
 [62]
 Id. Sec. 11.81
 
 
 [63]
 Id. Sec. 11.83
 
 
 [64]
 Id. Sec. 11.80(c)
 
 
 [65]
 Id. Sec. 11.83(b)(1)
 
 
 [66]
 Id. Sec. 11.83(c)(1)
 
 
 [67]
 Id. Sec. 11.83(c)(2)
 
 
 [68]
 Id. Sec. 11.83(d)
 
 
 [69]
 Id. Sec. 11.83(d)(5)(i)
 
 
 [70]
 Type B Technical Information Document; "Techniques to Measure Damages to Natural Resources," DOI CERCLA 301 Project (1987) at 2-35-2-36, J.A. 850-851 [hereinafter Type B Technical Information Document]. This document was prepared by DOI to accompany the Type B rules. See Natural Resource Damage Assessments, Final Rule, 51 Fed.Reg. 27,720 (1986) [hereinafter Final Rule]
 See also R. Bishop & T. Heberlein, The Contingent Valuation Method (paper presented at National Workshop on Non-Market Valuations Methods and Their Use in Environmental Planning, University of Canterbury, New Zealand (December 2-5, 1985)) (discussing bidding game, open-ended question, payment-card, dichotomous-choice and contingent ranking formats) at 7-11, J.A. 3017-3022.
 
 
 [71]
 Type B Technical Information Document, supra note 70, at 2-31, 2-32, J.A. 846, 847
 
 
 [72]
 Option value is the dollar amount an individual is willing to pay although he or she is not currently using a resource but wishes to reserve the option to use that resource in a certain state of being in the future. Final Rule, supra note 70, 51 Fed.Reg. at 27,692, 27,721. For example, an individual who does not plan to use a beach or visit the Grand Canyon may nevertheless place some value on preservation of the resource in its natural state for personal enjoyment in the event of a later change of mind
 
 
 [73]
 Existence value is the dollar amount an individual is willing to pay although he or she does not plan to use the resource, either at present or in the future. The payment is for the knowledge that the resource will continue to exist in a given state of being. Final Rule, supra note 70, 51 Fed.Reg. at 27,692, 27,721. Though lacking any interest in personally enjoying the resource, an individual may attach some value to it because he or she may wish to have the resource available for others to enjoy
 
 
 [74]
 43 C.F.R. Sec. 11.84(d)(5)(i) (1988)
 
 
 [75]
 Industry Petitioners are the Chemical Manufacturers Association, the Dana Corporation, and the Public Service Electric and Gas Company. The Chemical Manufactures Association consists of 75 national and multinational corporations producing chemicals. The Dana Corporation, a manufacturer, has 44 American subsidiaries and affiliates, and 116 foreign subsidiaries and affiliates. Public Service Electric and Gas Company is a utility licensed to supply electricity and gas in New Jersey, and has two subsidiaries
 
 
 [76]
 We have found DOI's current hierarchy of use values inconsistent with CERCLA. See Part VI supra. This does not affect the manner in which the CV methodology operates, or whether it produces sufficiently accurate results to be included in the regulations
 
 
 [77]
 Industry Petitioners also contend that DOI's natural resource damage assessment regulations are invalid to the extent that they authorize resort to CV methodology for purposes of calculating option and existence values. These, they assert, are nonuse values, and as such are not allowable under CERCLA. It suffices to point out that we have already rejected this conclusion. See Part VI supra. Option and existence values are non-consumptive values compensable under the terms of CERCLA
 
 
 [78]
 See Part III(c)(3)(a) supra
 
 
 [79]
 CERCLA Sec. 301(c)(2), 42 U.S.C. Sec. 9651(c)(2) (1982)
 
 
 [80]
 See infra note 83
 
 
 [81]
 Final Rule, supra note 70, 51 Fed.Reg. at 27,721
 
 
 [82]
 DOI, in the face of critical comments, "recognize[d] that the application of willingness-to-accept," formerly a factor in option and existence valuation, "can lead to more technical difficulties and uncertainties than willingness-to-pay." Final Rule, supra note 70, 51 Fed.Reg. at 27,721. The conclusion was reached that, as studies indicated, use of willingness-to-accept--meaning an individual is to be paid to forfeit his interest in a resource, as opposed to the individual himself paying to preserve that interest--yielded disproportionally high dollar assessments. For example, one study showed that actual payments for goose hunting licenses were $880,000 while willingness-to-sell was $1,411,000, and willingness-to-pay was only $293,000. See Bishop & Heberlein, Measuring Values of Extra Market Goods: Are Indirect Measures Biased?, 61 Amer.J.Agric.Econ. 926 (1979)
 
 
 [83]
 DOI examined 23 CV studies, in each of which the analysis included the implications of CV use in valuing damaged natural resources. Type B Technical Information Document, supra note 70, at 2-40-2-43, J.A. 855-857. DOI also consulted 323 articles and studies relating to natural resource assessments, including many treatises addressing CV methodology, and compiled them in an annotated bibliography. Id. at A-3-A-66, J.A. 862-925
 
 
 [84]
 Water Resources Council Procedures, 44 Fed.Reg. 72,892, 72,958, Subpart K, App. 2, Sec. (a)(3) (1979)
 
 
 [85]
 Final Rule, supra note 70, 51 Fed.Reg. at 27,721
 
 
 [86]
 Industry Petitioners cite a study estimating the combined option and existence values to Texas residents of whooping cranes at $109,000,000 (13.9 million Texas residents X $7.13). The estimate rested upon responses to a survey eliciting the amount an individual would pay for a permit to visit the National Wildlife Refuge where the whooping crane winters. Had the survey been nationwide in scope, the estimate would have been $1.58 billion. Brief for Industry Petitioners at 14 n. 24 (referring to J. Stoll & L. Johnson, Concepts of Value, Nonmarket Valuation, and the Case of the Whooping Crane (Natural Resources Working Paper Series, National Resource Workgroup, Dep't of Agricultural Economics, Texas A & M Univ.) (1984) at 23-24, J.A. 2828-2829)
 
 
 [87]
 Thus, in the whooping crane scenario referred to by Industry Petitioners, see note 86 supra, the intent of CERCLA would be realized, not contravened, by a more expansive survey and a correspondingly higher assessment of damages if people beyond the borders of Texas were affected
 
 
 [88]
 Bishop & Heberlein, supra note 82, at 926
 
 
 [89]
 Id. at 927
 
 
 [90]
 The study states that
 if people believe (correctly or incorrectly) that their responses will influence actual fees they may be more concerned about keeping their fees low than revealing their true values to the investigator.
 Id. at 927. Another study acknowledges that respondents may have an incentive to overstate, but likewise remarks that an incentive to understate exists equally. See E. Yang, R. Dower & M. Menefee, The Use of Economic Analysis in Valuing Natural Resource Damages, An Overview, Envtl.Law Inst. 1, 59 (grant paper) (1983), J.A. 2843, 2851.
 
 
 [91]
 A third study cited by Industry Petitioners, R. Bishop, T. Heberlein, M. Welsch & R. Baumgartner, Does Contingent Valuation Work? Results of the Sandhill Experiment (research paper delivered at Cornell University) (Aug. 5-8, 1984), J.A. 2277, concludes that "although contingent valuation is somewhat inaccurate, we have been surprised at how well it performed." Id. at 33, J.A. 2309. The study further reported that "while contingent valuation appears to be biased even under the best circumstances, the degree of bias does not appear to be sufficient to rule out the results in public decision-making. In our judgment, contingent valuation is a promising approach to the valuation of non-market commodities." Id
 
 
 [92]
 "Any determination or assessment of damages to natural resources for the purposes of this chapter and section 1321 of Title 33 [the Clean Water Act] made by a Federal or State trustee in accordance with the regulations promulgated under section 9651 of this title shall have the force and effect of a rebuttable presumption on behalf of the trustee in any administrative or judicial proceeding under this chapter or section 1321 of Title 33." 42 U.S.C. Sec. 9607(f)(2)(C) (Supp. IV 1986)
 
 
 [93]
 Id
 
 
 [94]
 43 C.F.R. Sec. 11.91(c) (1988)
 
 
 [95]
 Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443, 458 (1983)
 
 
 [96]
 Eagle-Picher Indus. v. EPA, 245 U.S.App.D.C. 179, 195, 759 F.2d 905, 921 (1985) (footnote omitted)
 
 
 [97]
 Id. at 195, 759 F.2d at 921 (footnote omitted)
 
 
 [98]
 NRDC v. Herrington, 247 U.S.App.D.C. 340, 370, 768 F.2d 1355, 1385 (1985); see also Eagle-Picher Indus. v. EPA, supra note 96, 245 U.S.App.D.C. at 195-196, 759 F.2d at 921-922; Small Refiner Lead Phase-Down Task Force v. EPA, 227 U.S.App.D.C. 201, 203, 705 F.2d 506, 535 (1983); Sierra Club v. Costle, 211 U.S.App.D.C. 336, 370-371, 657 F.2d 298, 332-333 (1981); American Pub. Gas Ass'n v. FPC, 186 U.S.App.D.C. 23, 54, 567 F.2d 1016, 1037 (1977)
 
 
 [99]
 See Final Rule, supra note 70, 51 Fed.Reg. at 27,720-27,722. See also Type B Technical Information Document, supra note 70, at iii, J.A. 816
 
 
 [100]
 See Final Rule, supra note 70, at 27,720
 
 
 [101]
 DOI reasserted on numerous occasions that selections of methodologies and their application pivoted on the scope of injury, which necessitated case-by-case determinations by the authorized official. See Final Rule, supra note 70, at 27,720-27,722
 
 
 [102]
 Type B Technical Information Document, supra note 70, at 2-39, J.A. 854. At the outset the group comprising a representative population of affected individuals must be chosen. Although in-person interviews were seen as being generally more reliable, telephone and mail surveys may be resorted to equally
 
 
 [103]
 Id
 
 
 [104]
 Final Rule, supra note 70, 51 Fed.Reg. at 27,721
 
 
 [105]
 Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752, 766 (1976) (citations omitted)
 
 
 [106]
 See 43 C.F.R. Secs. 11.23-11.25 (the preassessment screen: generally, information on the site, preliminary identification of resources potentially at risk); Secs. 11.30-11.35 (the assessment plan: generally, content, development, deciding on Type A or Type B assessments, confirmation of exposure, economic methodology determination); Secs. 11.61-11.64 (injury determination phase: generally, injury definition, pathway determination, testing and sampling methods); and Secs. 11.70-11.73 (quantification phase: generally, service reduction quantification, baseline services determination, resource recoverability analysis)
 
 
 [107]
 See note 60 supra
 
 
 [108]
 The regulations provide for notice to potentially responsible parties that the official will perform an assessment, 43 C.F.R. Sec. 11.32(a)(2)(B) (1988); public involvement in reviewing the assessment plan, including involvement by potentially responsible parties, id. Sec. 11.32(c)(1); and participation by potentially responsible parties, at the option and under the supervision of the official, in the assessment itself, id. Sec. 11.32(d). Potentially responsible parties must thus be indulged significant opportunities for involvement and input into the assessment process
 
 
 [109]
 787 F.2d 128 (3rd Cir.1986), aff'd without opinion by an equally divided court, 481 U.S. 735, 107 S.Ct. 2171, 95 L.Ed.2d 692 (1987)
 
 
 [110]
 29 U.S.C. Sec. 1401(a)(3)(A) (1982)
 
 
 [111]
 United Retail & Wholesale Employees v. Yahn & McDonnell, supra note 109, 787 F.2d at 138
 
 
 [112]
 Id. at 139-40. But see Washington Star Co. v. International Typographical Union Negotiated Pension Plan, 235 U.S.App.D.C. 1, 10, 729 F.2d 1502, 1511 (1984)
 
 
 [113]
 CERCLA Sec. 107(f)(1), 42 U.S.C. Sec. 9607(f)(1) (Supp. IV 1986)